# Illinois Official Reports

## Appellate Court

---

### *People v. Simmons*, 2016 IL App (1st) 131300

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTOINE SIMMONS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-1300 |
| Filed<br>Rehearing denied | September 22, 2016<br>November 17, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-03703; the Hon. Thomas Joseph Hennelly, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Therese Bissell, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Janet C. Mahoney, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant Antoine Simmons was convicted of first degree murder based on evidence that he shot and killed Larry Watkins at a stoplight at the corner of Garfield Boulevard and Michigan Avenue in Chicago. Three eyewitnesses, including the two passengers in Watkins's car, identified defendant as the shooter. The State also presented evidence that a bullet found in Watkins's body matched a bullet recovered in the shooting of Ellen Williams. Williams testified that defendant had shot her in the hand about a month before Watkins's death.

¶ 2      Defendant appeals, raising seven issues: (1) that the State failed to prove him guilty beyond a reasonable doubt because the eyewitnesses' identifications of him were unreliable; (2) that the trial court erred in denying his motion to suppress the identifications because the judge who saw defendant testify was not the same judge who ultimately denied the motion and the outcome of the motion rested on a credibility determination; (3) that the expert who testified that the bullets from the Watkins and Williams shootings matched failed to lay an adequate foundation for his opinion, rendering his testimony inadmissible; (4) that the evidence of the Williams shooting was inadmissible because the State failed to show that defendant was involved in that shooting and any probative value attributable to that evidence substantially outweighed the risk of unfair prejudice it carried; (5) that the prosecution made improper comments during closing arguments; (6) that the trial court failed to consider defendant's rehabilitative potential when it sentenced defendant to natural life in prison; and (7) that three of the counts of murder of which he was convicted should be vacated pursuant to the one-act, one-crime doctrine.

¶ 3      We affirm defendant's conviction and sentence. Defendant was proven guilty beyond a reasonable doubt, where the three eyewitnesses' identifications of defendant as the shooter bore sufficient indicia of reliability and were corroborated by firearms evidence linking defendant to the crime. Defendant cannot claim that the trial court erred in ruling on his motion to suppress after reviewing a transcript, where that was the course of action his attorney suggested the trial court take. The trial court did not abuse its discretion in admitting the testimony of the State's firearms identification expert where the deficiencies in his testimony merely affected its weight, not its admissibility. Nor did the court err in admitting evidence of the Williams shooting where Williams, who knew defendant, identified him as the shooter and the evidence of the other shooting was significantly probative of defendant's identity. We also find that the prosecutor's remarks in closing arguments, though improper, did not prejudice defendant's right to a fair trial. Finally, we find that the trial court considered proper factors in sentencing defendant to natural life in prison and decline to reweigh the sentencing factors considered by the court.

¶ 4      We agree with defendant that three of his counts of murder must be vacated because they arose out of the same act. We direct the clerk to issue a corrected mittimus with only one count of first degree murder.

I. BACKGROUND

## A. Motion to Suppress Identifications

Prior to trial, defendant moved to suppress lineup identifications of him as the shooter, arguing both that the police improperly showed him to witnesses before conducting the lineups and that the compositions of the lineups were suggestive.

The hearing on the motion was conducted over the course of two dates. Judge Laws presided over the hearing on the first date.

On the first hearing date, defendant testified that the police took him to Area 1 police headquarters on the evening January 11, 2007. At the time, defendant was in a wheelchair because he had "just [been] shot" and could not walk.

Defendant testified that, when he arrived at Area 1, the officers left him in the back of the squad car in the parking lot. Another squad car pulled up next to defendant and shined a spotlight on defendant. Defendant testified that he tried to duck down, but the detective in the squad car made him raise his head into the light.

Defendant testified that he saw two people in the other car with a police officer. He said that he heard one of these people say, "I'm Blackstone. You the one that killed my man." The two men in the car then got out and approached defendant. One of the men said, "I'm Blackstone. I'm gonna kill you." Defendant testified that he believed "Blackstone" was a reference to a gang, but defendant did not know either man.

Defendant said that the officers in his squad car retrieved his wheelchair from the trunk and brought him into the police station. The officers took him to the bathroom, where he again saw one of the two men who had confronted him in the parking lot.

Defendant testified that the police put him in a lineup with four other people. The detectives took defendant's wheelchair from him and made him lean against the person next to him in the lineup. Defendant testified that, during the lineup, he heard one of the detectives say, "Hurry up. We ain't got time for this bullshit. Hurry up. Pick him up. You wasting our time," and "That's him. Antoine Simmons, guy number four, right there. Pick him out." Defendant testified that the detective also told another witness to pick him out of the lineup, saying, "That's the guy right there who killed your friend, Walker."

Defendant acknowledged that, in a picture of the lineup, he was seated. But he said that photograph was taken after the witnesses had picked him out.

Defendant testified that he had been convicted of four prior felonies: aggravated discharge of a firearm, two separate attempted murders, and escape.

After defendant testified, the parties agreed to continue the hearing so that defense counsel could locate another witness. The hearing was continued several times at defense counsel's request.

Eventually, the case was reassigned to Judge Hennelly. Defense counsel explained to Judge Hennelly that defendant had three cases pending and said, "The elected matter is a homicide in which we started a motion with Judge Laws. What I suggest to the Court is if this court could read the transcript from what we've heard already." The court replied, "Sure. I'm glad to do that." The parties agreed to continue the hearing again.

After one more continuance, the hearing resumed before Judge Hennelly. Judge Hennelly indicated that he had read the transcript of defendant's testimony, summarized defendant's

testimony, and asked defense counsel if the summary was accurate. Defense counsel said that it was and rested defendant's case.

¶ 19 The State called Detective Brian Lutzow, who testified that he conducted the lineup on January 11, 2007. Lutzow said that defendant was in a wheelchair when they picked him up from Cook County jail.

¶ 20 When Lutzow set up the lineup, he put defendant in a chair and brought him another chair so that he could put his feet up. Lutzow testified that the other participants in the lineup were also seated. Lutzow said that he kept the three witnesses who viewed the lineup separate from one another before and after they viewed it.

¶ 21 Lutzow denied displaying defendant before the witnesses in the parking lot of the police station. He also denied bringing defendant to the bathroom in front of any of the witnesses or instructing any of the witnesses to identify defendant.

¶ 22 The parties stipulated that, in a report prepared by Detective John Foster regarding the lineup, Foster said that the lineup participants were told "to approach the one-way mirror and perform facing movements so that both side[ ] profile[s] and full face position could be viewed."

¶ 23 The court reserved its ruling for a later date, at which time the court denied defendant's motion. The court explained:

> "I am faced with the situation where I have to juxtapose and judge the testimony of the defendant, who has been proven to be a convicted felon, against the testimony of a Chicago Police Officer, which I found came in un-rebutted and uncontradicted.
>
> Therefore, *** having reviewed [the defendant's] testimony, along with that of the detective, and the allegation that [defendant has] made, *** I choose to believe the testimony of the police detective.
>
> And the [defendant's] factual allegations I find to be without merit, and I frankly do not believe that factual allegations that [he has] made in [his] motion ***."

¶ 24                                          B. Trial

¶ 25 Karl Stevens and Jeffon Henson, two friends of the decedent, Larry Watkins, testified regarding the shooting.

¶ 26 On the evening of December 27, 2006, Stevens, Henson, and Watkins went to a liquor store and purchased champagne and small cigars to roll "blunts"—cigar rolling papers filled with marijuana. Stevens testified that he and Watkins had smoked two blunts that morning, and Henson testified that he had smoked marijuana earlier that day. Both Stevens and Henson denied being under the influence of marijuana at the time they went to the liquor store, however.

¶ 27 Watkins, Stevens, and Henson stopped at Watkins's house, picked up marijuana, and left in Watkins's car. Watkins drove, Stevens sat in the front passenger's seat, and Henson sat in the middle of the backseat.

¶ 28 The trio drove east along Garfield Boulevard (which is also known as 55th Street), stopping at a red light at the intersection of Garfield Boulevard and Wells Street. Stevens testified that he noticed a bright red Grand Am with "big rims," the number "22" on the side of it, and "some type of diamond shape over *** the vent" in the parking lot of a gas station on the corner. Stevens testified that, when the light turned green, the red car quickly pulled out of the

gas station and cut off the cars waiting at the light. At that point, Stevens did not get a good look at the driver of the red car, but he could tell the driver was a man. Stevens testified that, at the light at Garfield Boulevard and Wells Street, Watkins's car was first in line in the lane adjacent to the right-turn lane.

¶ 29    Henson also testified that he saw the red car come out of the gas station at Garfield Boulevard and Wells Street. He testified that he was able to see the driver, whom he identified as defendant, at that point. Henson testified that Watkins's car was waiting behind another car at the light, in the lane adjacent to the right-turn lane.

¶ 30    Watkins, Stevens, and Henson continued driving east. They caught up to the red car at the intersection of Garfield Boulevard and State Street, where they stopped at another red light. Stevens testified that, at that point, the red car was on their left. Stevens said that he saw the driver, whom he identified as defendant, and a woman in the front passenger's seat of the red car. Stevens testified that nothing was blocking his view of defendant and the streetlights were working that night. There were no lights on in the red car.

¶ 31    Henson testified that, when he, Stevens, and Watkins reached the State Street stoplight, the red car was on the right side of Watkins's car. Henson testified that he was lying across the backseat of Watkins's car with his back against the inside of the rear passenger-side door. Henson testified that he was able to see defendant in the red car again. He testified that nothing blocked his view of defendant and that the streetlights were working. He acknowledged that there were no lights on in the red car.

¶ 32    When the light at State Street turned green, Watkins, Stevens, and Henson began to drive again. They stopped for a third time at the light at Garfield Boulevard and Michigan Avenue, where they were again near the red car.

¶ 33    Stevens testified that the red car was on the left side of Watkins's car. Stevens testified that the music in the car was very loud. Stevens said that Watkins bumped him, trying to get his attention. Stevens reached to turn the music down, when he glanced to his left and saw the driver of the red car reaching toward Watkins's car with an object in his hand. Stevens saw a "flash" and felt Watkins lean on him. The car began to move forward, and Stevens tried to steer it. Stevens crashed the car into two parked cars, when Henson was able to reach into the front seat and put the car in park. Stevens jumped out of the car and ran to a nearby McDonald's, where he yelled for someone to call 911.

¶ 34    Henson testified that, when he, Stevens, and Watkins reached the Michigan Avenue stoplight, the red car was to their left. Henson saw the woman in the red car lean back and the passenger-side window of the red car roll down. Henson said that he tapped Watkins in order to get his attention because he thought that defendant was trying to speak to Watkins. Henson testified that he heard a shot but did not see a gun. When the shot went off, Henson ducked. He did not see defendant at that point.

¶ 35    Henson estimated that he remained ducked in the backseat for "a good minute." When he sat up, Watkins was slumped over and his foot was still on the gas. Henson testified that Stevens grabbed the wheel of the car and turned it, smashing into several cars. The crash caused the car to stop, when Henson reached over, pulled Watkins's foot off the gas, and put the car in park.

¶ 36 Henson testified that he did not remember telling an assistant State's Attorney (ASA) that he saw defendant fire a handgun. He maintained that he did not see defendant with a gun at Garfield Boulevard and Michigan Avenue.

¶ 37 Stevens and Henson testified that they went to the police station on January 11, 2007, and separately viewed a lineup. They both testified that they identified defendant. Henson testified that, when the lineup participants entered, he noticed that one of them had difficulty walking. He also testified that, after the lineups, he saw defendant sitting in the back of a police car in the parking lot of the station. He acknowledged that the police shined a light on defendant in the parking lot.

¶ 38 Stevens testified that he had four felony convictions: a conviction for armed robbery in 2009, two convictions for delivery of cannabis in 2003 and 2005, and a conviction in 2005 for giving false information to the police. Stevens had also been convicted of a misdemeanor cannabis offense in 2007. He also had several misdemeanor charges made against him since Watkins's death, which were dismissed. Stevens testified that the State had never offered to dismiss any of charges against him, or offered him any other deals, in exchange for his testimony. Nor did the State make any threats in order to secure his testimony.

¶ 39 Henson testified that he had felony convictions for possession of a stolen motor vehicle in 2005, delivery of cannabis in 2007, and attempted burglary in 2011. He had also been convicted of several misdemeanors and had several misdemeanor charges dismissed following the shooting. Henson also testified that the State had not offered him any deals in exchange for his testimony in this case.

¶ 40 The parties stipulated that, at an earlier hearing, Henson testified that Stevens smoked another blunt before the shooting and that he believed that Stevens was under the influence of marijuana at the time of the shooting. And the parties stipulated that, when Henson arrived at the police station to view the lineup, a detective told him that they had "the possible guy who shot" Watkins.

¶ 41 Michael Smith also testified regarding the shooting. Smith said that, around 8:45 p.m. on December 27, 2006, he was driving east on Garfield Boulevard to drop off his friend. At the stoplight at the intersection of Garfield Boulevard and Wells Street, Smith saw a red Grand Prix with "nice wheels" cut him off as the light turned green. Smith identified a photograph of the red car—the same photograph that Stevens and Henson had identified as the red car defendant was driving. Smith testified that, at that time, he was in the lane adjacent to the right turn lane and was the first car in line at the light.

¶ 42 Smith testified that he recognized a black car two lanes to his left and two cars back that he recognized as Watkins's. Smith knew Watkins's face from the neighborhood but had no relationship with him. Smith also recognized Stevens and Henson from the neighborhood but did not know them personally.

¶ 43 Smith saw the driver at that point, and he identified defendant as the driver. Smith also noticed a woman in the front passenger's seat.

¶ 44 Smith said that, as he continued east on Garfield Boulevard, he lost sight of the red car because it was speeding. A few blocks east from Garfield Boulevard and Wells Street, Smith saw the car again. It was pulled alongside Watkins's car, moving slowly. Smith testified that the front passenger-side window of the red car was rolled down. He could not tell what the people in the cars were doing; he said they were "just rolling real slow."

¶ 45    Smith testified that, because the two cars were moving so slowly side-by-side, the other traffic began to go around them in the third lane. Smith also drove around the red car and black car.

¶ 46    Smith said that after he passed them, he heard a "pop" noise. He looked in his rearview mirror and saw the black car swerve and hit a parked car. The red car sped away, passed Smith, and turned south onto Martin Luther King Drive.

¶ 47    Smith dropped off his friend, and on his way home, he passed the location where he had heard the pop. He saw yellow police tape, stopped, and told the police what he had seen.

¶ 48    Smith testified that, on January 4, 2007, the police showed him a photo array, from which Smith picked defendant's picture. On January 11, 2007, Smith viewed an in-person lineup at the police station and again selected defendant as the driver of the red car.

¶ 49    Detective Lutzow went to the scene of the shooting around 9 p.m. on December 27, 2006. He spoke to Stevens, Henson, and Smith at the scene. Lutzow testified that they described defendant's car as a "Grand Prix, 22 inch rims with dents, 22 decals near the front wheels, and red in color, red or maroon." Lutzow also testified that Henson and Smith simply described the driver of the red car as "a male black" and that Stevens described the driver as "a male black with a clean look, clean hair." They described the passenger of the red car as "a female black [with] long hair." Lutzow did not include the description of the driver having "clean hair" in his reports.

¶ 50    Lutzow testified that he searched a Chicago police department database using the description of the red car he had received from the three eyewitnesses and obtained information on a vehicle matching that description. Lutzow sent out the vehicle's information in a citywide broadcast to other police officers.

¶ 51    Lutzow testified that, the next day, he heard that the red car had been recovered. He received a picture of the car that had been recovered and showed it to Stevens, Henson, and Smith. All three identified the photograph as a picture of the red car they had seen on December 27, 2006.

¶ 52    Lutzow testified that he also received a name in connection with the red car. Using that name, Lutzow compiled a photo array that he showed to Smith. Lutzow testified that Smith picked out defendant's picture from the array.

¶ 53    The medical examiner who performed Watkins's autopsy testified that his cause of death was a gunshot wound to the face. The wound to Watkins's face was irregular, which suggested that the bullet likely hit something, such as a window, before hitting him. The medical examiner uncovered a bullet lodged in Watkins's brain, which was sent to the Illinois State Police for testing.

¶ 54    The State introduced its other-crime evidence via two witnesses: Ellen Williams and Officer Ricky Thompson. Williams testified that she knew defendant through the father of her children, Abdulah Ali. Williams testified that, around 1 a.m. on November 14, 2006, she was in front of her friend's home at 8238 South Paulina Street in Chicago. Defendant pulled up in a "dark colored car" and spoke to Williams. Williams testified that she and defendant exchanged "very [harsh] words," then defendant drove away.

¶ 55    Williams testified that, five to seven minutes later, defendant emerged from an alley two houses down with a gun. She also said that defendant was "five feet" from her. On

cross-examination, she testified that defendant could have been six or seven feet from her. She also testified that she could see it was defendant because the streetlights were illuminated.

¶ 56    According to Williams, defendant yelled something at her and fired the gun. Williams tried to run into the house and noticed that her fingers were bleeding. She did not see where defendant went after he fired the shots. She also said that defendant fired "[m]aybe three" shots at her but that she was not sure.

¶ 57    Williams identified photographs of the front stoop of her friend's house. Those photographs show that the front door to the house was recessed slightly, so that a brick wall blocks the view of the stoop from the alley. On redirect examination, Williams testified that she was not on the stoop when defendant shot at her; she testified that she was in front of the house. She added that nothing blocked her view of defendant when he emerged from the alley. The photographs showed no blood on the sidewalk in front of the house.

¶ 58    Williams called the police and paramedics, who took her to the hospital. She was treated for the graze wound to her fingers. While at the hospital, a police officer discovered a bullet in Williams's jacket.

¶ 59    Williams testified that she told the police that defendant had shot her. She also identified defendant in a photo array.

¶ 60    On cross-examination, Williams testified that Ali had been incarcerated shortly before November 14, 2006. She denied blaming defendant for Ali's incarceration and testified that Ali did not shoot one of defendant's friends. She also testified that she did not know whether defendant yelled, "I had your baby's daddy locked up," when he pulled up in his car.

¶ 61    The parties stipulated that Williams had been convicted of felony manufacturing or delivery of a controlled substance in 1997. They also stipulated that Williams told a detective that she believed that defendant "had something to do with her boyfriend *** getting arrested" and that she heard defendant fire one or two shots at her.

¶ 62    Officer Thompson testified that he responded to the Williams shooting on November 14, 2006. He testified that Williams said that the car defendant had pulled up in was a black Chrysler and that defendant said, "I had your baby's daddy locked up." He testified that his partner found a bullet in Williams's jacket at the hospital. That bullet was sent to the Illinois State Police for testing.

¶ 63    Brian Mayland, a forensic scientist specializing in firearms identification with the Illinois State Police was permitted, over defendant's objection, to testify as an expert in firearms and tool mark identification. Mayland testified that, when comparing two bullets to determine if they were fired from the same gun, he used a comparison microscope that allowed him to simultaneously view the two bullets side-by-side. Mayland testified that, in comparing bullets or cartridge casings, he "look[ed] at the marks left behind as a result of the firing process." He testified that gun barrels have irregularities from the manufacturing process and from "tool wear" that leave "imperfections *** on the bullet or cartridge case as a result of having been fired from a gun."

¶ 64    Mayland testified that "[c]lass characteristics are generally things that are measurable and determined prior to an item being manufactured." Class characteristics include the number of lands and grooves left on a bullet, as well as the direction in which those lands and grooves twist. By contrast, he said, "individual characteristics *** are those marks left behind by the imperfection[s] in the firearm."

¶ 65      Mayland was assigned to compare the bullet found in Watkins's brain to the bullet found in Williams's jacket. The Watkins bullet was either a 10-millimeter or .40-caliber; Mayland could not tell which because he did not have a cartridge case with which he could associate it. He also determined that its class characteristics were six lands and grooves with a right-hand twist.

¶ 66      The Williams bullet had been examined by a different examiner before Mayland looked at it. Mayland testified that the other examiner's notes indicated that it had the same class characteristics as the Watkins bullet. He did not specify what those class characteristics were.

¶ 67      Mayland testified that he then examined the Watkins bullet and the Williams bullet under a comparison microscope. Mayland testified that, using the microscope, he "could compare the marks on the bullets." He opined that the bullets were fired from the same gun. Defense counsel objected to that opinion, stating that it lacked foundation. The trial court overruled the objection.

¶ 68      On cross-examination, Mayland testified that he could not say whether two bullets came from the same gun based solely on the class characteristics. He testified that the individual characteristics left on a bullet signify the firearm it came from.

¶ 69      Mayland acknowledged that both of the bullets in this case were deformed. And he acknowledged that he did not have a gun to which he could compare the bullets. Mayland said that he would have "prefer[red]" to have a gun so he could fire test bullets that he could compare to the fired bullets.

¶ 70      Mayland testified that his opinion was "subjective" and that the Illinois State Police had no "standards" or "statistical basis that [he] used to reach [his] conclusion[ ]." He testified that he simply looked for "sufficient agreement," which was "a subjective analysis based on the examiner's opinion."

¶ 71      When defense counsel probed further into the basis for Mayland's opinion, the following colloquy occurred:

"Q. Now, you based your determination on sufficient agreement, right?

A. Correct, based on my training and experience and looking at the evidence through the comparison microscope, yes, I determined that the agreement that I observed was more than any agreement I had ever seen between two bullets fired from two different guns, and it was consistent with the agreement I've seen in bullets fired in the same gun.

Q. Okay, what was the agreement?

A. There were imperfection [*sic*] in the bullet that left stria marks behind on the bullet.

Q. Okay, stria marks means lines, correct?

A. Correct.

Q. And what were they?

A. I'm not sure I understand your question.

Q. What were those striated lines that you're saying matched?

A. Again they were striated lines present on the surface of the bullet.

Q. Can you tell us what they were?

A. They were lines on a bullet.

Q. Can you tell us what the width was?

A. No, ma'am.

Q. Can you tell us what the length was?

A. No, ma'am.

Q. Can you tell us if there were imperfections in the lines?

A. No, I cannot.

* * *

Q. You're not saying it was your opinion that both of these bullets were fired in the same firearm to the exclusion of all other firearms, are you, sir?

A. No, I am not."

¶ 72    Mayland acknowledged that there had been criticism of the "sufficient agreement" standard and calls for "a firmer statistical basis" for firearms examination. He also testified that other firearms examiners used a method called "consecutive matching stria," which use data regarding the imperfections of a bullet "to form a numerical criteria to determine how many of those [imperfections] would need to lineup [*sic*] in order to have a match." But, he said, the Illinois State Police did not use the consecutive matching stria method. Mayland testified that the "sufficient agreement" standard was commonly accepted in the field of firearms and tool mark identification. The consecutive matching stria method, on the other hand, was not commonly accepted. He recognized that the consecutive matching stria method appeared to be "more objective" than the standard he applied.

¶ 73    Outside the presence of the jury, defense counsel moved to strike Mayland's testimony based on a lack of foundation for his opinion. Citing *People v. Safford*, 392 Ill. App. 3d 212 (2009), defense counsel noted that Mayland was unable to state the basis for his opinion so that the jurors "could evaluate for themselves what the agreement between the two bullets [was]." The court denied the motion, noting that *Safford* dealt with fingerprint comparison and that Mayland "testified consistently with the generally accepted scientific procedures that are currently *** accepted in the scientific community." The court added that defense counsel was free to point out the deficiencies in Mayland's opinion during closing arguments.

¶ 74    Defendant called paramedic Jerry Williams, who testified that, around 1 a.m. on November 14, 2006, he spoke with Ellen Williams at 8238 South Paulina Street. She told him that she heard three gunshots, and he described her as "somewhat uncooperative."

¶ 75    In her closing argument, defense counsel argued that the jury should not credit Mayland's opinion that the Watkins bullet and the Williams bullet were fired from the same gun. Counsel argued that Mayland simply "eyeball[ed]" the two bullets and could not define "sufficient agreement" when pressed. Counsel also argued:

"Sufficient agreement. What is it? Tell us about those marks. What matched? I can't.

Did he tell you where on the bullet those marks were? Did he tell you what matched up? Did he tell you how many things matched up? Did he describe those microscopic marks to you? Or is he just asking you to take his word for it? That's up to you. That's up to you to decide if you're going to take his word for it.

* * *

- 10 -

Okay. We have firearms that are mass manufactured, ladies and gentlemen. He's saying there's a uniqueness in microscopic markings that he can't tell you what they are. He can't tell you what the matches are."

Counsel also noted that Mayland did not have a firearm to fire test bullets from and that the consecutive matching stria method of firearm identification was more reliable.

¶ 76    In her rebuttal closing argument, the prosecutor urged the jury to credit Mayland's opinion. She argued that Mayland "actually said that he's never seen as much agreement in any of his analyses than on these two bullets." Defense counsel objected to that comment, but the trial court overruled that objection. The prosecutor also argued that the consecutive matching stria method was "not accepted," that "[n]obody follows it," and that no laboratories followed it "because it's not accurate." Defense counsel objected to these remarks, and the trial court overruled her objections. But the court also instructed the jury to disregard any arguments that were not supported by the evidence.

¶ 77    During their deliberations, the jurors sent out two notes. One asked for transcripts of Stevens's and Smith's testimony and for information about the woman in defendant's car. The court provided the transcripts and told the jurors that they had heard all of the evidence. The second note, sent out about two hours later, read, "The jury currently stands at: Ten guilty, one not guilty, and one undecided." It did not say that the jury was deadlocked. The court instructed the jurors to continue deliberating. Two hours later, the jury returned a verdict of guilty on the first degree murder charges. The jury also found that defendant personally discharged the firearm that proximately caused Watkins's death.

¶ 78    After the verdict, defendant told the court that he wanted to fire his appointed counsel because of her performance and because his family was trying to hire a private attorney. A private attorney took over the case and filed a posttrial motion, which the trial court denied.

¶ 79    At sentencing, the State presented evidence that defendant was convicted of false impersonation of a police officer in 2010, attempted murder in 2000, aggravated discharge of a firearm in 1999, and escape in 1998. With respect to the aggravated-discharge case, a police officer testified that he saw defendant pull a gun out of his waistband and fire it on a public street. The State also presented certified copies of defendant's three convictions for possession of a controlled substance.

¶ 80    The State also introduced evidence of defendant's misconduct while he was incarcerated through the testimony of officers from the Illinois Department of Corrections and the Cook County jail.

¶ 81    Defendant testified at the sentencing hearing. Defendant testified that he joined the Black Disciples gang when he was 15 years old and quit the gang when he was 21 years old. Defendant testified that he left because his friends and brother had been murdered because of their gang membership. Defendant said he tried to obtain his GED but was incarcerated before he could complete it. Defendant said that the problems he had experienced while in custody were due to the animosity that other inmates and guards held against him.

¶ 82    Defendant's mother testified that, before he was incarcerated, he was a good father to his children. She also testified that defendant was "[v]ery smart" as a child and enrolled in a program for academically gifted students.

¶ 83    In sentencing defendant, the court gave "little or no weight to" the testimony of the correctional officers concerning defendant's behavior in jail. But the court emphasized the

facts of Watkins's murder and defendant's prior convictions. The court noted that defendant appeared to kill Watkins for no reason; it "was a crime of whim." The court interpreted this to mean that "defendant is a person who would kill at any time, at any place." The court also noted defendant's prior offenses, which involved the use of a firearm. The court found that defendant had "a predilection for violence with handguns" and was "beyond redemption [and] without any hope of rehabilitation." The court added that it considered the presentence investigation report (PSI), the aggravation and mitigation evidence presented by the parties, the statutory aggravating and mitigating factors, the financial impact of incarceration, and the parties' arguments.

¶ 84    The court sentenced defendant to 100 years' incarceration for first degree murder and to natural-life imprisonment for the sentencing enhancement related to defendant's use of a firearm. Defendant appeals.

¶ 85                                II. ANALYSIS
¶ 86                              A. Reasonable Doubt
¶ 87    Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt because the identification testimony that the State relied on was unreliable. In assessing the sufficiency of the evidence, we determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). We will not substitute our judgment for that of the trier of fact with regard to the credibility of witnesses, the weight to be given to each witness's testimony, or the reasonable inferences to be drawn from the evidence. *Id.* A defendant's conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 88    The prosecution has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime. 720 ILCS 5/3-1 (West 2012); *People v. Slim*, 127 Ill. 2d 302, 307 (1989). An identification of the accused by one credible witness may be sufficient to sustain a conviction. *Slim*, 127 Ill. 2d at 307. Conversely, an identification will not be deemed sufficient to support a conviction if it is vague or doubtful. *People v. Tatum*, 389 Ill. App. 3d 656, 661 (2009). The reliability of a witness's identification is a question for the trier of fact. *In re Keith C.*, 378 Ill. App. 3d 252, 258 (2007).

¶ 89    In assessing identification testimony, our courts have looked to the factors set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). In *Biggers*, the Court held that circumstances to be considered in evaluating an identification include (1) the opportunity the witness had to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the identification confrontation, and (5) the length of time between the crime and the identification. *Id.*; *Slim*, 127 Ill. 2d at 307-08. Our courts also consider whether the witness was acquainted with the suspect before the crime and whether there was any pressure on the witness to make an identification. *People v. Brooks*, 187 Ill. 2d 91, 130 (1999); *People v. Bryant*, 94 Ill. 2d 514, 521 (1983). No single factor is dispositive; the identification's reliability is based on the totality of the circumstances. *Biggers*, 409 U.S. at 199. We address each of these factors in turn.

¶ 90      With regard to the witnesses' opportunities to view the offender, Henson and Smith both testified that they were able to see that defendant was driving the red car when he pulled out of the gas station at Garfield Boulevard and Wells Street. Stevens testified that he was able to see defendant for the first time at the intersection of Garfield Boulevard and State Street. They testified that nothing obstructed their view of defendant's face. And although it was dark outside, the streetlights were illuminated, which enabled them to see defendant's face.

¶ 91      Defendant argues that their opportunity to view the offender was undermined by the fact that their testimony conflicted regarding the position of the various cars at the Garfield Boulevard and Wells Street stoplight. We agree that the witnesses were inconsistent in recounting where Watkins's and Smith's cars were located at that point. We would first note that the testimony indicated that defendant's car changed lanes at various times during this window of time, but the critical point is that it was the jury's duty to consider and resolve any inconsistencies in the testimony. See *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) ("The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact."). Moreover, none of the witnesses were inconsistent with respect to the locations of the cars at the time of the shooting. And the witnesses were generally consistent in their description of the events of that night. They are not so hopelessly contradictory that the jury would have been unreasonable in crediting them.

¶ 92      With respect to the second factor—the witnesses' degree of attention—Stevens, Henson, and Smith all said that their attention had been drawn to the red car at the intersection of Garfield Boulevard and Wells Street. Nothing indicates that any of them were distracted as they drove east and continued to see defendant's car among the traffic.

¶ 93      Defendant argues that there was evidence that Stevens and Henson were under the influence of marijuana at the time of the shooting. While there was such evidence, both Stevens and Henson denied being under the influence. This conflict in the testimony was the jury's responsibility to resolve. *Id.*

¶ 94      Defendant also argues that the witnesses indicated that their attention was more drawn to the red car than to the driver of the red car. He notes that each of the witnesses described the red car in greater detail than they described the shooter. While that may be true, the jury could also rationally conclude that the fact that each witness was so drawn to observing defendant's car meant that they were more likely to pay attention to the driver of that car than any other cars on the road. Viewing the evidence in the light most favorable to the State, we cannot say that the evidence showed that the witnesses failed to pay attention to the driver.

¶ 95      As to the third factor—the witnesses' prior identifications—defendant notes, and we agree, that the witnesses' descriptions of the shooter were fairly generic. Because the witnesses did not describe the shooter in detail, we consider this factor as weighing slightly against the State.

¶ 96      As to the fourth factor—the level of certainty displayed by the witnesses—none of the evidence suggested that the witnesses displayed any hesitancy when identifying defendant. But defendant argues that studies show that "there are low correlations between [a] witness's confidence and the accuracy of her identification." *People v. Allen*, 376 Ill. App. 3d 511, 524 (2007). While that may be true, a low correlation between confidence and accuracy does not necessarily mean that a witness's confidence should play *no* role in our analysis. Certainly, none of the witnesses wavered or displayed a lack of confidence that would undermine their identifications. Nor did defendant present any expert testimony or other evidence in the trial

court to suggest that this factor should be disregarded. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 56 ("Since defendant did not present expert testimony [on eyewitness identifications], we do not find defendant's argument persuasive that *** the witness's level of certainty[ ] should be given little weight."). This factor weighs in favor of the eyewitnesses' reliability.

¶ 97        The fifth factor—the time from the initial opportunity to view the offender to the initial identification—weighs in the State's favor. The shooting occurred approximately two weeks before Stevens and Henson identified defendant in the lineups and only one week before Smith identified defendant in a photo array. This relatively short time favors the State. See, *e.g.*, *People v. Williams*, 221 Ill. App. 3d 1061, 1068 (1991) (length of time between crime and identification favored State when witnesses identified defendant in photo array "10 days to two weeks after the crime was committed").

¶ 98        Defendant cites a secondary source for the proposition that "[t]he passing of a few hours has a dramatic effect on one's memory." While that may be true, our supreme court has upheld identifications made after much lengthier delays than the one in this case. See, *e.g.*, *People v. Holmes*, 141 Ill. 2d 204, 242 (1990) (finding that 18-month delay had "no significance" because of strength of eyewitness's identification); *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (finding that two-year delay did not invalidate identification). And again, we note that defendant presented no evidence—via expert testimony or otherwise—to show why the two-week delay would be particularly likely to impact the reliability of the identifications. In light of our supreme court's precedent on this issue, we find that this factor weighs in the State's favor.

¶ 99        We also note that Smith testified that he had previously seen defendant driving the red car in his neighborhood, which supports his identification. While Smith was not acquainted with defendant, his prior recognition of defendant lends additional support to his identification, which we must view in the light most favorable to the State.

¶ 100       Finally, we note that this was not a case where defendant was convicted based on eyewitness testimony alone. The State also presented evidence that the bullet from the Williams shooting matched the bullet found in Watkins's brain. Although defendant takes issue with the admissibility of this evidence, for purposes of our analysis of the sufficiency of the evidence at trial, we consider this evidence as corroborating the eyewitnesses' identifications.

¶ 101       In sum, several factors surrounding the three eyewitness identifications of defendant support the State's case. Thus, we cannot say that, viewing this evidence in the light most favorable to the State, no rational jury would have convicted defendant.

¶ 102                    B. Hearing on Motion to Suppress Identification

¶ 103       Defendant next contends that the trial court erred in ruling on his motion to suppress identification when a different judge heard defendant's testimony and the court's ruling was based on a determination that Detective Lutzow was more credible. According to defendant, the court could not make such a credibility determination without having seen the live testimony of both witnesses. The State argues that defendant cannot raise this issue because it was defense counsel's suggestion that the court simply read a transcript of defendant's testimony before ruling on the motion.

¶ 104    We agree with the State. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). Here, when the case was reassigned from Judge Laws to Judge Hennelly, defense counsel said, "What I suggest to the Court is if this court could read the transcript from what we've heard already." The trial court agreed to read the transcript, which included defendant's testimony. Defendant cannot argue that the trial court erred in undertaking a course of action that his attorney requested.[1]

¶ 105    Defendant maintains that we can review this issue for plain error, regardless of his attorney's suggestion. But the plain-error doctrine is an exception to forfeiture; it does not allow for review of errors invited by the defense. *People v. Harding*, 2012 IL App (2d) 101011, ¶¶ 16-17; see also *People v. Patrick*, 233 Ill. 2d 62, 77 (2009) ("We decline to address [defendant's] plain-error claim because [he] invited any error by submitting the jury instruction."). Because defendant suggested that the trial court read the transcript, we decline to consider whether the trial court's decision to read the transcript was erroneous.

¶ 106                              C. Foundation for Firearm Identification

¶ 107    Next, defendant claims that the testimony of the State's firearms and toolmark identification expert, Brian Mayland, lacked sufficient foundation because he did not specify the basis for his opinion that the bullet found in Watkins's brain was fired from the same gun as the bullet found in Williams's jacket. The State contends that any deficiencies in the basis for Mayland's opinion went to the weight of his testimony, not its admissibility.

¶ 108    Generally, we review the admissibility of evidence based on foundational objections under an abuse-of-discretion standard. *People v. Taylor*, 2011 IL 110067, ¶¶ 26-27. But both the State and defendant tell us that, in this case, we should apply *de novo* review because this issue presents a question of law.

¶ 109    We disagree. When presented with the question of whether a party laid a sufficient foundation for an expert's testimony, the Illinois Supreme Court has repeatedly applied an abuse of discretion standard of review. See, *e.g.*, *People v. Williams*, 238 Ill. 2d 125, 136 (2010), *aff'd*, 567 U.S. ___, 132 S. Ct. 2221 (2012) ("We apply the abuse of discretion standard to the defendant's foundational challenge to the trial court's admission of Lambatos' expert testimony."); *People v. Sutherland*, 223 Ill. 2d 187, 281 (2006) (applying abuse of discretion standard to trial court's refusal to bar expert testimony where expert testified to results of tests he did not perform); *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003) (defendant's claim that expert testimony was inadmissible as "lacking foundation" was reviewed for abuse of discretion); see also *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009) (noting that court would typically apply abuse of discretion standard to admission of expert's testimony about toxicology report he did not perform but applying *de novo* review where defendant claimed violation of sixth amendment confrontation right); *Jones v. O'Young*, 154 Ill. 2d 39, 44 (1992) ("A trial court's determination as to an expert's qualifications and competency to testify is not to be reversed on appeal unless the record indicate[s] that the decision was an abuse of discretion.").

---

[1]We also note that defendant does not claim that his attorney was ineffective for making this request.

¶ 110    For the proposition that we should review *de novo* the trial court's determination on the sufficiency of foundation for an expert's opinion, the parties cite *Safford*, 392 Ill. App. 3d at 221. We cannot square *Safford* with the supreme court case law we have cited above and, in any event, we find the reasoning in *Safford* to be flawed.

¶ 111    In support of its application of *de novo* review, the court in *Safford* cited *People v. Chapman*, 194 Ill. 2d 186 (2000), and *Koon v. United States*, 518 U.S. 81 (1996). First of all, neither *Chapman* nor *Koon* dealt with a challenge to the reliability or sufficiency of the foundation for an expert opinion. See *Chapman*, 194 Ill. 2d at 209 (reviewing denial of motion to suppress); *Koon*, 518 U.S. at 85 (reviewing decision to depart from sentencing guidelines). *Safford* cited *Chapman* parenthetically for the proposition that "where the facts are not in dispute, our review is *de novo*." *Safford*, 392 Ill. App. 3d at 221. We do not quarrel with that proposition as a general principle, but we do not find it applicable to a situation, as here, where the trial court is asked to make determinations of reliability and sufficiency after hearing testimony. Indeed, what *Chapman* said on this topic was: "*De novo* review is appropriate *** when there are no factual or credibility disputes, and the appeal therefore involves a pure question of law." *Chapman*, 194 Ill. 2d at 217. The debate over the reliability of the foundation for Mayland's testimony does not fall into that category; the trial court was called upon to resolve issues of fact and credibility.

¶ 112    *Safford* cited the United States Supreme Court decision in *Koon* parenthetically for the proposition that " '[l]ittle turns *** on whether we label review of this particular question abuse of discretion or *de novo*, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction.' " *Safford*, 392 Ill. App. 3d at 222 (quoting *Koon*, 518 U.S. at 100). Again, we are no in position to disagree with that principle, but we do not find it applicable to our question. The court in *Koon* was discussing whether a federal district judge's consideration of a legally impermissible sentencing factor should be reviewed *de novo* or whether it should fall within the general standard of review of sentencing decisions: abuse of discretion. *Koon*, 518 U.S. at 100. The court saw no problem in analyzing the sentence for an abuse of discretion, even if part of that determination involved making the purely legal judgment of whether a particular factor was or was not a legally permissible consideration under the statutory sentencing guidelines. *Id.* We do not see why *Koon* would have led the court in *Safford* to conclude that the factual sufficiency of foundation for expert testimony should be governed by a *de novo* review.

¶ 113    The court in *Safford* also cited *Hiscott v. Peters*, 324 Ill. App. 3d 114 (2001), *overruled on other grounds by Thornton v. Garcini*, 237 Ill. 2d 100 (2010), in support of the notion that foundation is a question of law. *Safford*, 392 Ill. App. 3d at 221. While the court in *Hiscott* did state that foundation is a question of law, it did so only to clarify that it is the trial court, and not the jury, that determines the adequacy of the foundation for expert testimony. *Hiscott*, 324 Ill. App. 3d at 122-23. The court in *Hiscott* made it clear that "[i]t is the function of the trial court, and not the jury, to determine whether the foundational requirements have been met" (*id.*), a statement with which we agree, and the court did refer to the question as a "question of law" (*id.* at 123), but the court did not mean that *de novo* review was the appropriate standard. Indeed, when deciding whether the trial court erred in allowing the expert to testify, the court in *Hiscott* applied an abuse of discretion standard of review. See *id.* ("we are convinced that the trial court abused its discretion in allowing" challenged testimony).

- 16 -

¶ 114    Thus, we respectfully disagree with *Safford*, as well as the body of appellate case law that has developed under *Safford*, on the question of the appropriate standard of review of the sufficiency of the foundation for an expert's opinion. See *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 35; *People v. Negron*, 2012 IL App (1st) 101194, ¶ 34; *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 38 (relying on *Negron*). We decline to follow those cases and apply an abuse of discretion standard as consistently articulated by our supreme court. An abuse of discretion will be found only where the trial court's ruling is so arbitrary or fanciful that " 'no reasonable person would take the view adopted by the trial court.' " *People v. Patrick*, 233 Ill. 2d 62, 68 (2009) (quoting *People v. Hall*, 195 Ill. 2d 1, 20 (2000)).

¶ 115    We now turn to the merits of defendant's foundational challenge. A witness may be qualified to testify as an expert "by knowledge, skill, experience, training, or education." Ill. R. Evid. 702 (eff. Jan. 1, 2011). Along with establishing an expert's credentials, "[t]he admission of expert testimony requires the proponent to lay an adequate foundation establishing that the information on which the expert bases her opinion is reliable." *Fronabarger v. Burns*, 385 Ill. App. 3d 560, 565 (2008). And to determine whether that information is reliable, the court must ask whether it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Ill. R. Evid. 703 (eff. Jan. 1, 2011); see *City of Chicago v. Anthony*, 136 Ill. 2d 169, 186 (1990) (when determining if information is reliable, courts ask whether "the underlying facts or data upon which [the expert] seeks to base an opinion are of a type reasonably relied upon by experts in the particular field"). "If a proper foundation has been laid, the expert's testimony is admissible, but the weight to be assigned to that testimony is for the jury to determine." *Fronabarger*, 385 Ill. App. 3d at 565.

¶ 116    Defendant again cites *Safford*, as well as *People v. Jones*, 2015 IL App (1st) 121016, in support of his argument that Mayland's opinion lacked foundation. At the outset, we note that *Jones* is no longer good law. On October 26, 2015, the Illinois Supreme Court entered a supervisory order directing this court to vacate its judgment in *Jones* because the defendant in that case had died. *People v. Jones*, No. 119826 (Ill. Oct. 26, 2015) (supervisory order). And on November 12, 2015, we complied with that supervisory order, vacating the judgment in *Jones*. We cannot consider *Jones*, as that judgment has no effect. See *Kelch v. Watson*, 237 Ill. App. 3d 875, 877 (1992) ("The effect of a vacated order is that of a void order."); *George W. Kennedy Construction Co. v. Industrial Comm'n*, 152 Ill. App. 3d 114, 120-21 (1987) (order vacating judgment renders that judgment void).

¶ 117    Thus, defendant's argument is premised on *Safford*. In *Safford*, the defendant argued that the trial court erred in admitting the expert opinion of a latent fingerprint examiner who did not testify as to the evidentiary basis for his opinion. *Safford*, 392 Ill. App. 3d at 220. The court stressed that " 'the admission of an expert's testimony requires the proponent to lay an adequate foundation establishing that the information upon which the expert bases his opinion is reliable.' " *Id.* at 221 (quoting *Hiscott*, 324 Ill. App. 3d at 122). The fingerprint examiner testified that, when comparing fingerprints, he generally looked to three levels of detail in order to determine the points of comparison between the prints. *Id.* at 217. But he did not testify regarding any points of comparison he noted between the defendant's print and the latent print; he simply testified to his conclusion that the prints matched. *Id.* at 216-17, 226.

¶ 118    The court held that this testimony failed to disclose an adequate foundation for the examiner's opinion, rendering his testimony inadmissible. *Id.* at 226, 228. The court was particularly concerned with defendant's inability to cross-examine the expert on the reasons

underlying his opinion. *Id.* at 223-25. The court stated, "Without a real opportunity to challenge how an expert reached his conclusion, a trier of fact is left in the dark as to the reliability and trustworthiness of the result." *Id.* at 223. The court was also concerned that, without disclosing the bases for an expert opinion, "the jury may [improperly] ascribe an 'aura of reliability and trustworthiness' to the expert's conclusion." *Id.* at 226.

¶ 119    Justice Wolfson dissented in *Safford*, finding that the expert's testimony "was sufficient, barely, to place his conclusions before the jury." *Id.* at 231 (Wolfson, J., dissenting). Justice Wolfson noted that the examiner disclosed the methods he used in comparing the prints and his conclusion. *Id.* He stated that the lack of specificity in the examiner's testimony was a point of "vigorous" cross-examination and that it was up to the jury to decide whether to accept the testimony. *Id.* at 232.

¶ 120    Defendant analogizes Mayland's testimony to that of the fingerprint expert in *Safford*. Defendant notes that, like the expert in *Safford*, Mayland simply testified to the process he uses to compare bullets and his ultimate conclusion that the bullets matched. He noted that the class characteristics of the bullet matched but could not identify any of the individual characteristics that he found to be comparable between the two bullets. And, as Mayland conceded, the individual characteristics of two bullets are what enables him to determine whether two bullets match; the class characteristics alone cannot establish a match.

¶ 121    While we agree with defendant that Mayland's testimony was, to say the least, sparse, we do not agree that the defects in his testimony rendered it inadmissible. "[T]he basis for a witness' opinion generally does not affect his standing as an expert; such matters go only to the weight of the evidence ***." *Snelson*, 204 Ill. 2d at 26. And "the weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion." *Id.* at 27.

¶ 122    Although Mayland did not explain what individual characteristics he saw that led him to conclude that the Watkins bullet and the Williams bullet matched, the absence of any such specificity simply went to the weight of his opinion. Defense counsel certainly probed Mayland's opinion during cross-examination and argued that the jury should disregard it because it lacked any reasoned basis. In fact, defense counsel even elicited evidence that there is a more objective method for firearm identification—the consecutive matching stria method—that Mayland did not use.

¶ 123    We agree with defendant that Mayland's opinion is similar to the expert opinion found to be inadmissible in *Safford*, but we decline to follow *Safford*. As this court explained in *Negron*, 2012 IL App (1st) 101194, ¶ 41, "*Safford* is an outlier case," and no court since *Safford* has required that an expert disclose the specific reasons for his opinion as a prerequisite to admissibility. Thus, the court in *Negron* found that "the fact that [the latent fingerprint examiner] did not rest his analysis or ultimate opinion on a specific number of comparison points" simply went to the weight of his opinion that certain fingerprints matched. *Id.* ¶ 42.

¶ 124    And looking to *Safford* itself, we conclude that its analysis was flawed. While the court in *Safford* cited the principle that the information on which an expert bases his opinion must be reliable (*Safford*, 392 Ill. App. 3d at 221), it did not correctly analyze that principle. That principle centers on whether "the underlying facts or data upon which [the expert] seeks to base an opinion are of a type reasonably relied upon by experts in the particular field." *Anthony*, 136 Ill. 2d at 186. But the majority in *Safford* asked a different question—whether the expert sufficiently detailed the reasons for his opinion. The presence or absence of such details

is not the same as whether the expert relied on information of a type reasonably relied upon by experts in his field.

¶ 125    In this case, Mayland testified that he relied on the two bullets' class characteristics and individual characteristics to reach his conclusion. He testified that other firearms and toolmark examiners rely on this information in conducting their analyses. Thus, the State established that Mayland based his opinion on reliable information, *i.e.*, information on which other experts in his field rely. That he did not specify *which* individual characteristics matched on these particular bullets (*i.e.*, the basis of his opinion) simply affected the weight of his opinion—a question for the jury to resolve, not a question for the court to resolve when deciding whether to admit or exclude Mayland's testimony.

¶ 126    Moreover, we disagree with the court's conclusion in *Safford* that the failure to reveal the basis for an expert opinion necessarily curtails a defendant's right to cross-examine the expert. This case provides an excellent example. Here, defense counsel cross-examined Mayland on his inability to specify which individual characteristics he identified as matching on the two bullets. And she was able to elicit testimony that the Illinois State Police lack objective criteria to guide their firearms comparison and that the consecutive matching stria method of identification has a more objective, data-driven foundation. Defense counsel then used these points in her closing argument. While Mayland's testimony did not help defendant—defendant would have benefitted most had Mayland's testimony been excluded entirely—his inability to recall which individual characteristics he identified did not preclude defense counsel from ably cross-examining Mayland.

¶ 127    This court's decision in *People v. O'Neal*, 118 Ill. App. 2d 116 (1969), supports our conclusion. In *O'Neal*, a firearms identification technician testified that, when comparing two bullets, he looked at their class and individual characteristics via a comparison microscope. *Id.* at 121-22. He testified that a bullet fired from the defendant's gun matched a fired bullet found in the victim's coat. *Id.* at 122. On appeal, the defendant argued that the expert's opinion lacked foundation because "the basis of his opinion was not placed before the jury, [and] that either the test bullets *** or an explanation of the particular similarities should have been offered into evidence." *Id.* This court held that the expert's testimony was properly admitted despite the lack of an explanation regarding the particular similarities between the bullets:

> "He *** testified that he fired the gun twice, and that he compared the test bullets with the one in question. He testified to the procedure generally used and to the reasons why a comparison of bullets will reveal the identity of the gun which fired them. On the basis of these tests, he was of the opinion that the gun found on defendant's person fired the bullet found in the complaining witness's coat. The expert witness set forth the reasons for his conclusion, and it was for the triers of fact to determine how much weight to give to his testimony." *Id.* at 123-24.

¶ 128    Like the expert in *O'Neal*, Mayland testified that, when comparing two bullets, he looks at their class characteristics and their individual characteristics under a comparison microscope. He testified that he applied this method in this case, finding that the Watkins bullet and the Williams bullet shared class characteristics and that the individual characteristics of the guns shared enough similarities that he could conclude, albeit not conclusively by his own admission, that the bullets were fired from the same gun. The failure to specify which individual characteristics were the same simply diminished the weight of his testimony, which defense counsel deftly highlighted in her cross-examination and closing argument.

- 19 -

¶ 129       We also find *United States v. Bastanipour*, 697 F.2d 170 (7th Cir. 1982), instructive. In that case, the government's expert witness, a chemical analyst, was permitted to opine that a specific substance contained heroin. *Id.* at 176. The expert testified that he "did not recall the literature spectra upon which he based his analysis and that he had lost or destroyed the 'standard' spectra which he had compared against the literature spectra." *Id.* He also "acknowledged that he knew nothing about the computer program" he used to form his opinion. *Id.* The court found that these deficiencies in the expert's opinion were "matters of weight, not admissibility." *Id.* at 177. The court also noted that the expert's inability to recall the bases of his opinion did not curtail the defendant's right to cross-examine the expert, as "defense counsel was able to attack the weight of the expert's opinion by calling attention to his failure to retain certain materials or information relating to the lab tests, and also his ignorance of the details of the computer program." *Id.*[2]

¶ 130       Mayland, like the expert in *Bastanipour*, could not say why he concluded that the bullets had sufficient agreement with one another. As the court in *Bastanipour* noted, that deficiency simply affected the weight of Mayland's opinion, not its admissibility. And, like defense counsel in *Bastanipour*, defense counsel in this case was able to cross-examine Mayland on the absence of reasoning underlying his opinion and to use that absence in her closing argument.

¶ 131       The trial court did not abuse its discretion in permitting Mayland to offer his opinion. Mayland's inability to specify which individual characteristics of the bullets matched went to the weight of his testimony, not its admissibility. And the weight of Mayland's testimony was a matter that was properly left to the jury.

¶ 132                                    D. Other-Crimes Evidence

¶ 133       Defendant next contends that the trial court erred in admitting evidence that defendant had shot Ellen Williams in the hand over a month before he shot and killed Watkins. Evidence that a defendant committed a crime other than the charged offense is generally inadmissible when used to prove the defendant's propensity to commit crimes. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Pikes*, 2013 IL 115171, ¶ 14. But such evidence may be admitted for any other purpose, including proving the defendant's identity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *Pikes*, 2013 IL 115171, ¶ 14.

¶ 134       In this case, defendant concedes that the State did not attempt to use the Williams shooting as improper propensity evidence. Instead, it was used to prove defendant's identity, as the State introduced evidence linking the bullet found during the investigation of the Williams shooting to the bullet found in Watkins's brain. But defendant contends that the other-crime evidence was inadmissible for two other reasons: (1) because the State failed to prove that defendant committed the Williams shooting and (2) because the unfair prejudice created by the Williams shooting substantially outweighed its probative value.

¶ 135       We review the trial court's admission of other-crimes evidence for an abuse of discretion. *People v. Thingvold*, 145 Ill. 2d 441, 452-53 (1991).

---

[2]We note that the Federal Rules of Evidence largely mirror the Illinois Rules of Evidence with regard to the foundation that must be laid for expert witness testimony. Compare Fed. R. Evid. 703, 705, with Ill. R. Evid. 703, 705 (eff. Jan. 1, 2011). Thus, we find federal law persuasive, even if it is not binding.

¶ 136                                    1. *Proof of Defendant's Involvement in the Prior Shooting*

¶ 137          Defendant first argues that the State failed to introduce sufficient evidence to tie him to the Williams shooting, thus rendering evidence of that shooting inadmissible.

¶ 138          Before reaching the merits of defendant's claim, we must address the State's argument that defendant forfeited review of this issue. In a criminal case, a defendant preserves an issue for review by raising it either in a motion *in limine* or a contemporaneous trial objection and by including it in a posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. There is no dispute that defendant complied with the first requirement. But the State claims that defendant failed to raise this specific issue in his motion for a new trial.

¶ 139          Defendant's motion for a new trial asserted the following regarding the admission of the other-crime evidence:

> "The Court erred in granting the State's Motion to Admit Other Crimes Evidence. The testimony related to the other crimes evidence, especially that of Ellen Williams[,] was highly prejudicial and lacked sufficient probative value to outweigh the prejudicial effect it had on the jury's decision."

Thus, defendant raised his claim in his posttrial motion. Admittedly, defendant did not articulate the sufficiency of the evidence of the other crime as a basis for denying the State's motion. But that does not result in forfeiture, when defendant raised the court's decision on the motion *in limine* as a contention of error.

¶ 140          Our supreme court has stated that a defendant preserves a claim for appeal where he provides the trial court with an opportunity "to review the same essential claim that was later raised on appeal." *People v. Heider*, 231 Ill. 2d 1, 18 (2008). For example, in *People v. Mohr*, 228 Ill. 2d 53, 64-65 (2008), the court held that the defendant did not forfeit his challenge to a jury instruction where he raised different challenges to the instruction at trial and in his posttrial motion. The court rejected a requirement that "the defendant *** assert the same argument at trial and in his posttrial motion as to why an instruction was improper." *Id.* at 65. Similarly, in *People v. Perry*, 224 Ill. 2d 312, 347 (2007), the court found that the defendant had preserved the issue of whether his attorney was ineffective for failing to object to certain remarks in the prosecution's closing argument, even though "the specific statements to which defendant *** object[ed] [were] not precisely the same statements that he mentioned in his posttrial motions."

¶ 141          Here, defendant opposed the State's motion *in limine* and, in his posttrial motion, argued that the trial court had erred in granting the State's motion. The trial court had an opportunity to review the admissibility of the other-crime evidence, which is essentially the same claim that defendant now raises. Defendant sufficiently preserved his challenge to the admission of the other-crime evidence, even if he did not raise precisely the same reasons in the trial court that he advances here.

¶ 142          We now turn to the substance of defendant's argument. "When the State seeks admission of other-crimes evidence, it must first show that a crime took place and that the defendant committed it or participated in its commission." *Pikes*, 2013 IL 115171, ¶ 15. The State does

not need to prove the defendant's involvement beyond a reasonable doubt, "but such proof must be more than a mere suspicion." *Thingvold*, 145 Ill. 2d at 456.[3]

¶ 143    We hold that the State introduced sufficient evidence to tie defendant to the Williams shooting. Williams, who knew defendant through her boyfriend, testified that she and defendant had an argument, after which defendant drove off. She testified that, shortly thereafter, she saw defendant emerge from an alley and fire several shots at her. This was more than a mere suspicion that defendant committed the shooting—it was direct evidence that defendant shot Williams.

¶ 144    We find that *People v. Johnson*, 368 Ill. App. 3d 1146 (2006), is instructive regarding the sufficiency of the State's evidence of the other crime in this case. In *Johnson*, the defendant was on trial for the attempted murder of two individuals. *Id.* at 1149. The State presented evidence of other shootings that occurred on the same day, which according to the State were tied to the defendant's effort to get revenge for the death of his cousin. *Id.* at 1150. None of the witnesses to the other shootings identified the defendant as the shooter. *Id.* at 1152-53. Still, the court held that the State presented sufficient evidence to tie the defendant to the other shootings because the same gun that had been used in the charged offense had been used in one of the other shootings and had been linked to the defendant, the defendant's appearance matched the description of the suspect in one of the other shootings, and some of the victims of the other shootings were in some way connected with the death of the defendant's cousin. *Id.* at 1159.

¶ 145    In this case, the State presented far more direct evidence than the evidence that was found to be sufficient in *Johnson*. Unlike *Johnson*, where there was no testimony identifying the defendant as the shooter involved in the other crimes, Williams identified defendant as the shooter in this case.

¶ 146    Defendant acknowledges that Williams identified him but claims that her testimony "was unbelievable." Defendant notes that he introduced evidence that Williams had a motive to testify against him—there was evidence that she blamed defendant for her boyfriend's incarceration—and that her testimony contained numerous inconsistencies. But the deficiencies in Williams' testimony went to the weight of her testimony, not its admissibility. See, *e.g.*, *People v. Nash*, 2013 IL App (1st) 113366, ¶ 21 ("The impeachment of [the other-crimes witness] on some of the details of the incident affected the weight to be given to her testimony [citation], but the account she provided *** sufficiently established more than a mere suspicion that the crime had occurred and that [the defendant] was involved in it [citation]."). We cannot say that the trial court unreasonably or arbitrarily admitted evidence of the other shooting when there was eyewitness testimony tying defendant to the shooting.

¶ 147    Defendant cites *Thingvold*, 145 Ill. 2d 441, in support of his claim that the State failed to link him to the Williams shooting, but *Thingvold* involved far weaker evidence of the defendant's involvement in the other crime. In *Thingvold*, the defendant was charged with soliciting individuals to murder his wife. *Id.* at 445. The State presented evidence that the defendant's wife had been stabbed numerous times on one occasion and, on a later occasion,

---

[3] Defendant notes that, in the federal system, the government must prove the defendant's involvement in another crime by a preponderance of the evidence. *United States v. Lucas*, 521 F.3d 861, 865 (8th Cir. 2008). But Illinois has not adopted this standard. In this case, we need not address whether to adopt the federal system's burden of proof, as our conclusion would be the same under either standard.

stabbed to death. *Id.* at 455-57. The supreme court held that the State failed to connect the defendant to the stabbing because the State "acknowledged that [the] defendant did not attack" his wife, the person who stabbed the defendant's wife was never identified or arrested, and all of the State's witnesses who testified that defendant had solicited them to commit the murder had never taken any steps toward actually committing the murder. *Id.* at 456, 460-61.

¶ 148 Here, unlike *Thingvold*, there was direct evidence tying defendant to the Williams shooting. Although there were deficiencies in the State's other-crime evidence, those deficiencies merely affected the weight of the evidence.

¶ 149 2. *Probative Value Versus Prejudicial Effect*

¶ 150 Defendant also argues that the trial court erred in admitting evidence of the Williams shooting because the prejudicial effect of that evidence substantially outweighed its probative value. Even if other-crimes evidence is otherwise admissible, the trial court should exclude it if the court finds that the probative value of that evidence is substantially outweighed by the risk of unfair prejudice it poses. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003).

¶ 151 We cannot say that, in this case, the trial court abused its discretion in determining that the risk of unfair prejudice did not substantially outweigh the probative value of the evidence. As the court noted, the State sought to introduce evidence of the Williams shooting to prove defendant's identity as the person who shot Watkins. And the trial court noted that identity was the central issue in the case. Specifically, the fact that the bullet found during the Williams shooting matched the bullet found in Watkins's brain, coupled with Williams' identification of defendant as the person who shot her, provided substantial corroboration to the eyewitness accounts of the Watkins shooting. Thus, the evidence of the Williams shooting had significant probative value for the State.

¶ 152 As to the risk of unfair prejudice, we recognize that there was some risk that the jury would hear the evidence of the Williams shooting and use that evidence for an improper purpose. But the court quite emphatically instructed the jury to consider the evidence of the Williams shooting only for purposes of establishing defendant's identity. And the State made no attempt to use the evidence of the Williams shooting to draw an inference that defendant had a propensity to commit acts of violence in its closing arguments. We cannot say that the trial court acted unreasonably or arbitrarily in determining that any risk of unfair prejudice did not substantially outweigh the significant probative value that the evidence of the Williams shooting possessed.

¶ 153 Defendant also argues that the State failed to establish a threshold level of similarity between the two crimes to justify admission of the Williams shooting evidence. "Where other-crimes evidence is offered it is admissible only where the other crime bears some threshold similarity to the crime charged." *People v. Cruz*, 162 Ill. 2d 314, 348-49 (1994). But only in cases where the State seeks to use other-crime evidence to prove a defendant's *modus operandi* or common design must a " 'high degree of identity' " between the charged offense and the other conduct be established. *Id.* at 349 (quoting *People v. Illgen*, 145 Ill. 2d 353, 373 (1991)). When the other-crime evidence "is offered for some other purpose," "mere general areas of similarity will suffice." *Illgen*, 145 Ill. 2d at 373. Our supreme court has recognized that "some dissimilarity will always exist between independent offenses." *Id.* Thus, the other-crime evidence should only be excluded where the differences between the offense are "so great as to eliminate the probative value of the [other-crime] evidence." *Id.*

¶ 154 The key similarity between the Williams shooting and the Watkins shooting is the very fact giving the Williams shooting its probative value: that defendant used the same gun in both incidents. The evidence that defendant fired the same gun at Williams that was used to kill Watkins went to proving defendant's identity as the individual who killed Watkins. Moreover, the incidents occurred less than two months apart in Chicago. In light of the critical evidentiary link between the two offenses and the relatively short time span separating them, we cannot say that the differences between the two offenses are so great that they negate the probative value of the other-crime evidence.

¶ 155 We acknowledge that there was little else in common between the Williams shooting and the Watkins shooting. But the use of the same firearm and the short lapse of time were sufficient to justify admission of the Williams shooting. See, *e.g.*, *People v. Coleman*, 158 Ill. 2d 319, 333-35 (1994) (evidence of shooting that occurred several days after charged offense admissible to prove identity where expert testimony linked the gun used in both incidents); *People v. Martin*, 408 Ill. App. 3d 44, 49 (2011) (threshold similarity of other-crime evidence established to prove identity where same gun used in both incidents and both incidents occurred less than three weeks apart in Chicago, even though the incidents "otherwise had little in common"). We conclude that the trial court did not abuse its discretion in admitting evidence of the Williams shooting.

¶ 156           E. Prosecutorial Misconduct

¶ 157 Defendant also claims that the prosecutor twice committed misconduct during her rebuttal closing argument by mischaracterizing the firearms evidence presented at trial.

¶ 158 Defendant urges us to apply *de novo* review. But there appears to be a conflict among Illinois Supreme Court cases regarding the correct standard for reviewing a prosecutor's remarks during argument. *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 32. The decisions in *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Sims*, 192 Ill. 2d 592, 615 (2000), suggest that we should review this issue *de novo*. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993), and *People v. Blue*, 189 Ill. 2d 99, 128 (2000), suggest that we should review this issue for an abuse of discretion. We need not take a position in this case because, under either standard, our conclusion is the same.

¶ 159 A prosecutor has wide latitude during closing arguments and may argue facts and reasonable inferences drawn therefrom. *People v. Kliner*, 185 Ill. 2d 81, 151 (1998). But prosecutors "may not argue assumptions or facts not contained in the record." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). "[C]omments made in closing argument must be considered in the proper context by examining the entire closing arguments of both the State and the defendant [citation]." *Kliner*, 185 Ill. 2d at 154-55.

¶ 160 Defendant first takes issue with the prosecutor's following comments regarding Mayland's testimony:

> "[Mayland] said—when counsel was questioning him, he actually said that he's never seen as much agreement in any of his analyses than on these two bullets. Never. Thousands and thousands of exams."

Mayland actually testified, "I determined that the agreement that I observed was more than any agreement I had ever seen between two bullets *fired from different guns*, and it was consistent with the agreement I've seen in bullets fired from the same gun." (Emphasis added.)

¶ 161    We agree with defendant that the prosecutor misstated Mayland's testimony. He did not testify that the Williams bullet and the Watkins bullet had more agreement than any two bullets he had ever seen. Rather, he simply said that they had more agreement than any bullets fired from different guns and that they more closely resembled the amount of agreement seen between bullets fired from the same gun. Thus, the prosecutor's argument exaggerated the strength of Mayland's opinion and was not based on the evidence at trial.

¶ 162    Second, the prosecutor argued that Mayland had testified that the consecutive matching stria method of firearms identification "is not accepted" and that "[n]obody follows it." She added, "These labs aren't following it because it's not accurate." Again, the prosecutor mischaracterized Mayland's testimony. A review of his testimony on cross-examination shows that he never said that the consecutive matching stria method had been universally rejected or was inaccurate:

"Q. And there's a proposal by other ballistics firearms examiners to use a method called consecutive matching stria, is that correct?

A. Yes.

Q. And the Illinois State Police crime lab doesn't use consecutive matching stria, isn't that correct?

A. That is correct.

Q. And consecutive matching stria is a system that tries to make the determination whether or not a bullet matches more objective, isn't that correct?

A. Consecutive matching stria basically uses the traditional matching method that I would use and then they have tried to get numerical data, and they analyze the name of striations, which are the lines formed by the imperfections in the barrel on the bullet. They are trying to form a numerical criteria to determine how many of those would need to lineup [*sic*] in order to have a match, yes.

Q. So that's something over and above what the Illinois State Police crime lab does, is that correct?

A. Yes, it's in addition to what we would do, yes."

And, although Mayland said that the consecutive matching stria method was not generally accepted, he testified that some crime labs do apply it. Thus, Mayland conceded that the consecutive matching stria method had gained some acceptance and that it provided an additional layer of analysis to the analysis he conducted. We fail to see how any of this testimony could support the prosecutor's remarks that "[n]obody" applies the method or that it is not accurate.

¶ 163    We now turn to the prejudice, if any, created by the prosecutor's improper remarks. When evaluating the prejudice caused by any improper comments, we ask whether "the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123. "Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction." *Id.* And if "the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Id.*

¶ 164    "[T]he prompt sustaining of an objection combined with a proper jury instruction usually is sufficient to cure any prejudice arising from an improper closing argument." *People v.*

*Johnson*, 208 Ill. 2d 53, 116 (2003). But our supreme court has held that, even when the court does not say that an objection has been sustained, an immediate instruction, together with subsequent instructions, may cure the prejudice resulting from "brief and isolated" remarks by the prosecution. See, *e.g.*, *id.* (defendant not prejudiced by prosecutor's argument shifting burden of proof where argument was brief and isolated, court immediately told jury that defendant did not need to testify, and jury was properly instructed on burden of proof and right to testify, even though "the trial court did not *sustain* defense counsel's objection" (emphasis in original)).

¶ 165    In this case, defense counsel objected to the prosecutor's improper remarks. While the trial court did not sustain those objections, the court told the jury, "Ladies and gentlemen, again, you've heard the evidence. You'll decide what the evidence is in this case." And, in response to another objection, the court stated, "Again, as I have cautioned you, what the lawyers say is not evidence. Any statement that is not supported by the evidence is to be disregarded by you." The court gave the same admonition in response to other objections made during closing arguments. In fact, throughout the course of the State and defense arguments, the court told the jury to disregard arguments that conflicted with the evidence eight times.

¶ 166    Moreover, before closing arguments even began, the court told the jury, "What the lawyers say during these closing arguments is not evidence and should not be considered by you as evidence." After closing arguments concluded, the court instructed the jury, "Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." By repeatedly telling the jury to disregard arguments that did not have support in the evidence, the trial court diminished any prejudice created by the prosecutor's misstatements regarding Mayland's testimony.

¶ 167    And the prosecutor's misstatements were brief and isolated. In a rebuttal argument that spans over 30 pages of trial transcript, the prosecutor misstated the evidence only twice, near the beginning of the argument. Coupled with the trial court's extensive instructions that reminded the jury not to credit arguments made without evidentiary support, we find that the prosecutor's improper remarks did not prejudice defendant.

¶ 168                                    F. Natural-Life Sentence

¶ 169    Next, defendant contends that the trial court erred in sentencing him to natural life in prison. Specifically, defendant argues that this sentence does not adequately reflect his rehabilitative potential, as evidenced by his employment prior to his arrest, his education, and his family life.

¶ 170    The trial court has broad discretion in imposing a sentence. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court is better-positioned to evaluate factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, and age. *Id.* Thus, we will not substitute our judgment for the trial court's simply because we would weigh the sentencing factors differently than the trial court. *Id.* But a trial court's discretion in sentencing is not without limits. *Id.* We will reduce a sentence imposed within statutory limits where it constitutes an abuse of discretion, *i.e.*, where the sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* at 210.

¶ 171    We hold that the trial court did not abuse its discretion in sentencing defendant to natural life in prison. In imposing that sentence, the trial court stressed two factors: (1) defendant's criminal history (especially those offenses in which defendant used a firearm) and (2) the need

to protect the public from defendant because of the apparently random nature of this crime. These were proper factors to consider. See 730 ILCS 5/5-5-3.2(a)(3) (West 2006) (defendant's "history of prior *** criminal activity" is proper aggravating factor); *People v. Lamkey*, 240 Ill. App. 3d 435, 442 (1992) ("the need to protect the public" from defendant was proper sentencing factor). It is not our place to reweigh the various aggravating and mitigating factors before the trial court. The trial court's emphasis of these two factors was not unreasonable or arbitrary.

¶ 172    And the record rebuts defendant's claim that the trial court did not consider any mitigating factors. The trial court expressly said that it considered mitigating evidence and read the PSI, which contained information about defendant's education and employment history. The trial court simply rejected the notion that defendant possessed any rehabilitative potential, stating that defendant had "demonstrated a predilection for violence with handguns" that showed that defendant was "beyond redemption [and] without any hope of rehabilitation." And we see no reason to disturb that conclusion, in light of defendant's significant history of violent acts and the seemingly random act of violence he committed in this case. We affirm defendant's sentence.

¶ 173                           G. One-Act, One-Crime

¶ 174    Finally, defendant contends, and the State agrees, that we should vacate three of the four counts of murder of which he was convicted because all four charges were supported by the same act.

¶ 175    Under the one-act, one-crime doctrine, a single physical act may only support a conviction for one offense. *People v. Artis*, 232 Ill. 2d 156, 161 (2009); *People v. King*, 66 Ill. 2d 551, 566 (1977). Thus, "when multiple convictions are obtained for offenses arising out of a single act, sentence is imposed on the most serious offense." *People v. Cardona*, 158 Ill. 2d 403, 411 (1994). Specifically, where there is only one victim in a murder case, "there can be but one conviction of murder." *Id.* Sentence should be imposed only on the most serious count of murder and any less-serious charges should be vacated. *Id.*

¶ 176    In this case, Watkins was the only victim. Consequently, defendant should have been sentenced on only the most serious count of murder, which the parties agree was count IX (first degree murder committed with the intent to kill and by defendant's personally discharging a firearm that proximately caused death). We vacate the other three counts of murder (counts I, III, and XI) and direct the circuit court clerk to amend the mittimus to reflect a single conviction for murder under count IX.

¶ 177                           III. CONCLUSION

¶ 178    For the reasons stated, we affirm defendant's conviction and sentence. We vacate counts I, III, and XI and direct the clerk to issue a corrected mittimus reflecting a sentence imposed only on count IX.

¶ 179    Affirmed in part and vacated in part; mittimus corrected.