2022 IL App (1st) 200162

FIRST DISTRICT
THIRD DIVISION
November 30, 2022

No. 1-20-0162

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 13613 |
| | ) | |
| STEVEN DIXON, | ) | Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant Steven Dixon appeals the trial court's first stage dismissal of his *pro se* postconviction petition. He contends his appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in admitting expert testimony regarding bloodstain patterns without a sufficient foundation.

¶ 2     On October 13, 1991, 16-year-old Tiffany Lindsey was found beaten and stabbed to death inside her apartment located at 47th Street and Drexel Boulevard in Chicago. Defendant admitted he was with Lindsey that morning and told police an unknown individual entered the apartment and attacked them. No charges were filed in 1991 because DNA analysis was not available at that time. The tests conducted then were only for the presence of human blood. Following new DNA testing in 2009, defendant was arrested and charged with Lindsey's murder. In April 2015, a jury found defendant guilty of first degree murder, and the trial court

subsequently sentenced defendant to a term of 40 years in prison. We outline the evidence presented at defendant's trial as necessary for our disposition of this appeal. A full discussion of the evidence presented at defendant's trial was set forth in *People v. Dixon*, 2018 IL App (1st) 153211-U.

¶ 3    In 1991, Lindsey was living in her own apartment with her one-year-old son Kendall. On October 11, 1991, Lindsey threw a party at her apartment for friends, including defendant, defendant's sister Candice Hogans, defendant's girlfriend Tameko Brown, and Tiffany Henderson Williams. Williams stayed at the party until around 3 or 4 a.m. on October 12. On the morning of October 13, 1991, Hogans saw defendant at their family home. Defendant looked shocked and had injuries on his chest and stomach. He told her that "someone came at him and [Lindsey]" and that someone should check on Lindsey. Hogans called Williams and Brown. Williams went to Lindsey's apartment with her sister and found Lindsey's back door was not closed or locked, which was unusual. She entered the apartment and saw Lindsey's son covered in blood and then found Lindsey's body. Williams described Lindsey's face as "beat up really bad," and Lindsey was covered; there was "a sheet wrapped from her waist like to her neck." Williams's sister tried to find a pulse but was unsuccessful. They exited the apartment with Kendall and told someone to call the police. Brown arrived at Lindsey's building after the police had arrived. Both women identified a pair of underwear discovered in Lindsey's living room as belonging to defendant.

¶ 4    The police investigator testified that there were no signs of forced entry at Lindsey's apartment. Several items were recovered near Lindsey's body: a Phillips head screwdriver, a padlock, two blue knife handles without the blades, a knife blade, a Newport cigarette case, a bottle of Hennessey cognac, and a can of "Old English" malt liquor. The investigator also

recovered a washrag from the floor near the kitchen sink and a second opened can of "Old English" from the kitchen table. Defendant's clothing was recovered at the hospital.

¶ 5     Lieutenant Scott DeDore met with defendant at Mercy Hospital. The lieutenant observed scratches on defendant's face. He informed defendant of his *Miranda* rights and defendant agreed to speak with him. See *Miranda v. Arizona*, 384 U.S. 436 (1966).

> "Defendant told the lieutenant that he was sleeping on the floor of Lindsey's apartment while Lindsey was sleeping on the couch. He woke up because 'he heard screams and he felt he was being cut.' He 'jumped' up, got dressed as he had only been wearing his pants, and fled the apartment. *** Defendant estimated this happened at approximately 7 a.m. When the lieutenant asked defendant if he called police or tried to help Lindsey, defendant responded that he was in shock and worried about himself. Lieutenant DeDore described defendant's demeanor as 'very calm.' Defendant did not provide a description of the person who cut him. Defendant did not ask about Lindsey's condition."
>
> *Dixon*, 2018 IL App (1st) 153211-U, ¶ 17.

¶ 6     A medical examiner testified about Lindsey's 1991 autopsy report, which disclosed multiple blunt and sharp force injuries to her face, head, and neck, as well as a beaten body. A handle-less knife blade was protruding from Lindsey's neck from left to right. The knife blade severed Lindsey's carotid artery. Lindsey also had a displaced skull fracture on her right temple, which broke through the skull and bruised her brain. Her fingernails, clothing, and blood were collected as evidence. The medical examiner estimated that she would have stayed in motion for a matter of seconds up to possibly a minute or two after the neck wound was inflicted. A toxicology report indicated there was no evidence of drugs or alcohol in Lindsey's system. A

3

police investigator found three teeth on the carpet next to Lindsey's body. Her hands were placed in bags to preserve any evidence under her fingernails.

¶ 7    In 2009, Detective Patrick Smith was assigned to investigate Lindsey's murder as part of his work in the cold case unit. He was aware that some of the evidence had been submitted to Orchid Cellmark laboratory (Cellmark) for DNA testing. After he received the results from the DNA testing, Detective Smith attempted to locate defendant and subsequently collected a blood sample from defendant in October 2010.

¶ 8    Cellmark conducted the testing on the evidence with DNA samples from Lindsey, defendant, and Kendall. The DNA results disclosed the following:

"Samples of blood stains on living room carpet, window shade and the washrag: Single source DNA consistent with Lindsey

Padlock: Mixed profile, the major contributor profile was Lindsey, Kendall could not be excluded as to the minor profile. No conclusion could be reached as to defendant as a contributor

Cigarette box: Mixed profile consistent with mixture of Lindsey and Kendall. Defendant was excluded as a DNA contributor

Screwdriver shaft: Mixed profile consistent with mixture of Lindsey and Kendall. Defendant was excluded as a DNA contributor

Screwdriver handle: DNA profile consistent with Lindsey

Knife blade from living room floor: DNA profile consistent with Lindsey

Knife handle #1: DNA profile consistent with Lindsey

Knife handle #1 (nonblood area): Major profile consistent with Lindsey, minor consistent with Kendall. Defendant was excluded as DNA contributor

4

Knife handle #2 (nonblood area): Partial DNA profile was mixture of defendant and Lindsey, Kendall could not be excluded.

Fingernail clippings from Lindsey: Mixed profile, major profile consistent with Lindsey and partial profile consistent with defendant. Kendall was excluded.

Blood crusts from Lindsey's fingernails: Partial predominant profile consistent with defendant

Cuttings from defendant's sweatshirt hood, inside sweatshirt waistband, left jacket sleeve, right jacket sleeve, and inside front panel of jacket: DNA profile consistent with defendant

Cuttings from back of left leg of defendant's jeans: Mixed profile, major full profile consistent with Lindsey, minor partial from unknown individual. No conclusion could be drawn as to defendant, Kendall was excluded

Cuttings from right front leg of defendant's jeans: Single source DNA profile consistent with Lindsey

Cutting from defendant's right shoe: Single source DNA profile consistent with Lindsey

Swab of defendant's right hand: Mixed profile, major profile originated from Lindsey and defendant could not be excluded as minor contributor. Kendall was excluded." *Id.* ¶ 23.

¶ 9     Investigator Thomas Merchie performed the blood spatter analysis on defendant's clothing in early 2011. During *voir dire*, he testified that he was trained in blood pattern analysis with over 220 hours of specific training during his 24-year career as a crime scene investigator with the Illinois State Police and that he had previously testified as an expert in blood pattern

analysis 10 to 12 times. He admitted that he did not have a science degree and had not published any papers or articles in the field. The court tendered Investigator Merchie as an expert in blood pattern stain analysis, and no objection was made on the record.

¶ 10    During his testimony, he opined that the blood drops on defendant's right shoe came from the toe area and traveled toward the rear of the shoe. This opinion was based on the tail of the blood drop moving toward the back of the shoe. Investigator Merchie testified that defendant's right shoe had over 100 bloodstains, but none of the stains were on the back of the shoe. Based on the size, number, and pattern of the bloodstains, he opined that the source of the blood was in front of where the shoe was pointed. The stains were not left by incidental contact, and the size of the bloodstains indicated a blunt force trauma. In comparison, defendant's left shoe had fewer bloodstains, approximately 20 to 30 stains, and they were located on the top and the right side of the shoe.

¶ 11    Investigator Merchie also analyzed defendant's jeans for blood spatter. He found more stains on the right leg than the left, and the majority of the stains were below the knee. He testified that the absorbency of the cloth distorted the stains at times, because the spread in the absorbed fabric caused some of the stains to not show direction. Investigator Merchie opined that, because the stains on both the shoes and the pants were similar in size and shape, it indicated that both items were in the same or approximately the same location when the blood struck them. He opined that the shoe was mostly likely on the floor and within two to three feet from the source of the blood.

¶ 12    Investigator Merchie conceded that his report did not include some of the details disclosed in his testimony. Specifically, in his report, he stated that the shoes and pants were "within several feet" of the blood source. He also did not state in his report that the left shoe was

facing the blood source, that the right shoe and pants were closer to the blood source, or that the right pant leg and right shoe were together at the time of impact. He did not perform mathematical calculations to determine angles of the blood pattern because it was not necessary for his analysis. He admitted that his opinion was partially shaped by the crime scene photos.

¶ 13    Defendant testified on his own behalf. He grew up in the same neighborhood as Lindsey and had known her most of his life. In October 1991, defendant was 16 years old and lived with his family. He had been in a relationship with Brown for two years, and she was pregnant with his child. He also had a sexual relationship with Lindsey that had been going on for two years. Brown and Lindsey were best friends, but defendant stated that Brown did not know about his relationship with Lindsey.

¶ 14    Lindsey moved to a different neighborhood, near 47th Street and Drexel Avenue, in the summer of 1991. Defendant estimated that he had visited Lindsey at her apartment five or six times. The apartment had two entrances, a front door and a back door. He used the back door because he did not like the guys in her neighborhood who would be in the front of Lindsey's apartment. According to defendant, Lindsey supported herself by selling drugs, and he and Lindsey sold drugs together.

¶ 15    Lindsey had a party at her apartment the weekend of her murder, which defendant attended with a friend. Lindsey had thrown the party because the guys in her neighborhood did not like that she was selling drugs and the party was to show them "that she had people who had her back." Defendant left the party at some point with his friend and went to sell drugs for an hour or two to make money. He later took the bus back to Lindsey's apartment. When he got to Lindsey's apartment, it was late, and the party was over. He entered through the back door. He

7

had consensual sex with Lindsey on the floor while her child was asleep on the couch. Afterwards, he slept on the floor of the apartment, and Lindsey slept on the couch with her child.

¶ 16    Defendant woke up after hearing "loud screams." He could not tell where the screams were coming from. Once he started to wake up, he "felt a sharp object coming at [him]." The sharp object was coming from someone else in the apartment. He felt the object on his face and his abdomen. He could not see who was attacking him. Defendant described the room as "semi" dark with no lights on and the sun was not up. Defendant wrestled with the person, but he still could not see the person's face or tell whether the person was black or white. He assumed the attacker was a man. He could not see the sharp object the attacker was holding. He could not say how long the wrestling lasted; he stated that it felt like hours but probably lasted "a matter of minutes." The wrestling ended when defendant was hit in the head with an unknown object. Defendant testified that this strike caused him to become "semi conscious." After he was hit in the head, he did not see where the attacker went, and he did not see where Lindsey was.

¶ 17    When defendant became more conscious, he saw Lindsey on the floor. He went over to Lindsey and noticed she had something in her neck. Defendant tried to pull the knife out of her neck, but the handle fell off. He testified that Lindsey was still breathing. He stated that, "It was like she had tried to say something, and blood had spurted, and I was, like, man, I'm fixin' to get some help." Defendant then grabbed his shoes, shirt, and jacket, and ran out of the apartment. His clothes had been close to him on the floor, but he forgot to take his underwear. Defendant exited through the back door. He did not close Lindsey's back door and burglar gate.

¶ 18    Once home, he told his family to have someone go check on Lindsey "because somebody had ran in the house on us." His mother then took him to Mercy Hospital. While at the hospital, defendant remembered speaking to the police, but he did not remember the police asking him for

a description of the attacker. He denied killing Lindsey. He denied having any sort of fight or disagreement with Lindsey.

¶ 19     On cross-examination, defendant testified that the party at Lindsey's apartment was on Saturday, October 12, 1991. He stated a few of his friends knew he had been having consensual sex with Lindsey, but his girlfriend Brown did not know. He did not know if Williams knew about his relationship with Lindsey, but it was possible she knew.

¶ 20     When defendant was wrestling the attacker, they were not face to face but were "in close proximity." His hands were on this person's body, but he did not know what part of the body. Defendant testified that it was a violent struggle and they moved around the apartment. He did not know if the person ever fell down, but it was possible that they pushed each other. During the struggle, he never felt or saw where Lindsey or her child were located. He did not hear Lindsey or her child during the struggle. The attacker was able to cut him while they fought. Defendant did not know if he was hit in the head by the person he was fighting. He was struck on the right side in the back of his head. Defendant testified that he was unconscious after being struck, but he did not know how long he was out. It was so dark in the apartment that he could not see the whites of the attacker's eyes. When he woke up after being struck, the apartment was lighter, and he was able to see. As he left, defendant did not knock on any doors in the building for help or ask anyone to call the police or an ambulance. When he was at the hospital, he was "sure" he told the police he was hit in the head. He also told the police he struggled with the attacker in the apartment.

¶ 21     In rebuttal, the State recalled three witnesses. Lieutenant DeDore testified that defendant did not tell him that defendant had been struck in the head, that defendant had struggled with the attacker, that defendant had been knocked unconscious, or that he observed a knife protruding

from Lindsey's neck. Defendant did tell Lieutenant DeDore that the attack happened around 7 a.m. An evidence technician testified that, when he photographed defendant's injuries at Mercy Hospital, he had no information that defendant had been struck in the head. If he had been told about this injury, he would have photographed defendant's head.

¶ 22    Williams testified that Lindsey's party occurred on Friday, October 11, 1991, and the purpose was not to let the local drug dealers know that Lindsey was selling drugs and she was not intimidated by them. Lindsey did not have a party on Saturday, October 12, 1991. Williams was "real close" with Lindsey, and they shared the details of their romantic lives together. Lindsey did not have a sexual relationship with defendant, and Williams was not aware of a secret affair between defendant and Lindsey. Williams admitted it was "possible" that there were things Lindsey did not tell her.

¶ 23    Following closing arguments, the jury found defendant guilty of first degree murder. Defendant filed a motion for a new trial, which the trial court denied. The trial court subsequently sentenced defendant to 40 years in prison.

¶ 24    On direct appeal, defendant argued that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred in denying his motion to suppress during trial regarding the warrantless seizure of his clothing from the hospital, (3) he was denied a fair trial when the prosecution introduced irrelevant and prejudicial photographs of Lindsey's son and the prosecutor made improper comments during closing arguments, and (4) his mittimus should be corrected to reflect a single conviction for first degree murder. *Dixon*, 2018 IL App (1st) 153211-U, ¶ 3. This court affirmed defendant's conviction and sentence, with a correction to the mittimus to indicate one conviction for first degree murder. *Id.* ¶¶ 90-91.

¶ 25    In October 2019, defendant filed his *pro se* postconviction petition, alleging that (1) his appellate counsel was ineffective for failing to raise a claim that the testimony of Investigator Merchie lacked a foundation to qualify as an expert and that bloodstain pattern analysis was unreliable and (2) his sentence violated the United States Constitution and the proportionate penalties clause of the Illinois Constitution based on the holding of *Miller v. Alabama*, 567 U.S. 460 (2012). In support of his claims related to Investigator Merchie, defendant attached a portion of an unpublished report, titled "Strengthening Forensic Science in the United States: A Path Forward," which was submitted to the United States Department of Justice in 2009. Defendant's exhibit was a six-page excerpt of this report discussing the reliability of bloodstain analysis.

¶ 26    In December 2019, the trial court dismissed defendant's petition at the first stage and found defendant's claims were frivolous and patently without merit. Regarding the claims of ineffective assistance of appellate counsel, the court found that Investigator Merchie was properly certified as an expert, bloodstain pattern analysis is generally accepted by the scientific community, and Investigator Merchie testified about his methodology in support of his testimony. The court further concluded that defendant's petition "merely rehashes his counsel's arguments during cross-examination" and his arguments "merely go to the weight of Merchie's testimony, not the foundation."

¶ 27    This appeal followed.

¶ 28    The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-7 (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *Id.* § 122-1(a); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at

the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Where a petition attaches a constitutional label to allegations that do not raise a constitutional issue, dismissal is required. See *People v. Flores*, 153 Ill. 2d 264, 276-78 (1992) (the supreme court observed that the defendant's claim of ineffective assistance of postconviction counsel lacked a constitutional basis because the right to counsel in postconviction proceedings is statutory, not constitutional).

¶ 29 At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Id.* at 16-17.

¶ 30 If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2018). At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with

determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Post-Conviction Act. *Coleman*, 183 Ill. 2d at 380. The circuit court is not permitted to engage in any fact-finding or credibility determinations. *Id.* at 385. At this stage of the proceedings, we are to accept well-pleaded factual allegations of a postconviction petition and its supporting evidence as true unless they are positively rebutted by the record of the original trial proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 48. We disregard any legal conclusions unsupported by allegations of fact. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 48.

¶ 31    On appeal, defendant argues that he presented a meritorious claim of ineffective assistance of appellate counsel for failing to assert on direct appeal that the trial court erred in admitting Investigator Merchie's testimony. Specifically, defendant contends that Investigator Merchie's testimony lacked a proper foundation for his expert testimony because he admitted that he did not conduct any measurements or calculations in forming his opinion as to the angle at which the blood made contact with defendant's pants and shoes. Defendant asserts that this claim of ineffective assistance of appellate counsel has an arguable basis in both law and fact. Defendant has not pursued the other claims presented in his petition on appeal and has therefore forfeited those claims. See *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal).

¶ 32    A claim of ineffective assistance of counsel on appeal is cognizable under the Post-Conviction Act. *People v. Mack*, 167 Ill. 2d 525, 531 (1995). Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the United States Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the

13

sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). At the first stage of proceedings, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (1) it is arguable that counsel's performance fell below an objective standard of reasonableness and (2) it is arguable that the defendant was prejudiced. *People v. Cathey*, 2012 IL 111746, ¶ 23. Unless the underlying issue is meritorious, petitioner suffered no prejudice from counsel's failure to raise it on direct appeal. *Childress*, 191 Ill. 2d at 175. Further, it is essential that a postconviction claim of ineffective assistance of appellate counsel set forth an error of constitutional dimension that occurred during the trial, which counsel failed to raise on direct appeal. *People v. Cole*, 2012 IL App (1st) 102499, ¶ 18.

¶ 33      Defendant does not challenge Investigator Merchie's qualifications to testify as an expert witness in the field of bloodstain pattern analysis. Rather, he focuses on whether Investigator Merchie sufficiently disclosed the scientific basis for his conclusions to establish the reliability of the underlying information. According to defendant, Investigator Merchie's testimony was "riddled with scientific uncertainty," which calls the foundation for his opinion into doubt because he used "vague terms," such as "indicated," "most likely," "good chance," and "approximate." He further asserts that Investigator Merchie's failure to use any measurements or calculations in reaching his conclusions amounted to him asking the jury to "take his word for it." Defendant points to Investigator Merchie's testimony that (1) the sole of defendant's right shoe was "most likely on the floor within two to three feet" of the source of the blood, (2) the bloodstains on defendant's right shoe "indicated" that the shoe was "basically pointed towards

the source" of the blood, and (3) there was a "good chance" that defendant's shoes and pants "were in the same approximate location when the blood struck both items." Defendant also asserts that Investigator Merchie testified to multiple findings that were not included in his written report, such as his testimony that defendant's shoes were within two to three feet of the source while his report stated the shoes were likely within several feet of the source, that his report did not state that defendant's shoes and pants were likely together at the time of impact, and that his report omitted the right shoe and pant leg were closer to the source.

¶ 34    Expert testimony is admissible if the proffered witness is qualified as an expert, a foundation is laid as to the bases for the expert's opinions, and the testimony would assist the trier of fact in understanding the evidence. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 115. The proponent of the testimony must lay an adequate foundation for the testimony by showing that the facts or data relied upon by the expert are of a type reasonably relied on by experts in that particular field. *Id.* A scientific methodology need not be universally accepted or even accepted by a majority of experts in the field; rather, it is sufficient if the expert's opinion was based on the methodology reasonably relied upon by experts in that field. *People v. Comier*, 2020 IL App (1st) 170500, ¶ 82. " 'If a proper foundation has been laid, the expert's testimony is admissible, but the weight to be assigned to that testimony is for the jury to determine.' " *Simmons*, 2016 IL App (1st) 131300, ¶ 115 (quoting *Fronabarger v. Burns*, 385 Ill. App. 3d 560, 565 (2008)).

¶ 35    "To be qualified as an expert in a particular field, a person 'need only have knowledge and experience beyond that of an average citizen.' " *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 30 (quoting *Thompson v. Gordon*, 221 Ill. 2d 414, 429 (2006)). An expert may become an expert through practical experience alone. *Id.* " 'Formal academic training or specific

degrees are not required to qualify a person as an expert; practical experience in a field may serve just as well to qualify him.' " *People v. Tondini*, 2019 IL App (3d) 170370, ¶ 26 (quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 459 (1992)). A witness may be qualified to testify as an expert "by knowledge, skill, experience, training, or education." Ill. R. Evid. 702 (eff. Jan. 1, 2011). Expert testimony for bloodstain analysis has been recognized in Illinois for several decades. See *People v. Knox*, 121 Ill. App. 3d 579, 584 (1984) (finding a sufficient foundation for a police officer's expertise in bloodstain analysis based on his testimony as to the source of his training, the techniques he had learned, and their application in the field).

¶ 36    Moreover, "[t]he expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Ill. R. Evid. 705 (eff. Jan. 1, 2011); see *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 37; *People v. Williams*, 238 Ill. 2d 125, 137 (2010) ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence ***." (Internal quotation marks omitted.)). " '[A]ny weakness in the basis of an expert's opinion goes to the weight of the testimony; it should not affect its admissibility if the facts, data, or opinions are reasonably relied upon by experts in the relevant field.' " *Comier*, 2020 IL App (1st) 170500, ¶ 83 (quoting *People v. Lind*, 307 Ill. App. 3d 727, 739 (1999)). Under Rule 705, "the burden is placed upon the adverse party during cross-examination to elicit facts underlying the expert opinion." *Williams*, 238 Ill. 2d at 140.

¶ 37    The record explicitly details Investigator Merchie's training and his knowledge of bloodstain pattern analysis. At trial, Investigator Merchie was qualified as an expert in bloodstain

pattern analysis. He testified that he worked as a crime scene investigator with the Illinois State Police for 24 years with over 2000 hours of specialized training. He had over 220 hours of specific training in bloodstain pattern analysis, including multiple week-long training classes beginning in 1990. He had been qualified as an expert in bloodstain pattern analysis 10 to 12 times. Investigator Merchie did not have a degree in the sciences, but that was not common for experts in this field.

¶ 38    In addition to his extensive training, Investigator Merchie detailed the methodology of bloodstain pattern analysis and testified that these methods and principles are generally accepted in the scientific community. He explained that bloodstain pattern analysis is "the study of static aftermath of a bloodletting event." He used the blood as it landed and dried for his analysis, including on clothing and in photos. The purpose of this analysis is to gain information by "examining, documenting, and observing the stains and what we use as the size, shape, locations, the distribution, the numbers, and the pattern types of these stains to help us make a determination in our analysis." This information can help determine the position of the victim, whether the victim was moved, the sequence of events, and whether anything was moved. Bloodstain pattern analysis uses mathematics, physics, and biology to produce results. Bloodstains form on "two dimensional surfaces, and from observations of their size, shape, and distribution, conclusions can be drawn as to the mechanism that gave rise to their formation." He explained how blood drops fall according to the law of physics until it strikes a surface and, when it impacts on surface at less than a 90 degree angle, then the bloodstain will have an "elongated or elliptical appearance," and the trail of the drop will indicate the direction of travel. He used a magnifying glass with a scale in it to measure the length and width of the bloodstain. This testimony about his extensive training and the methodology used to analyze bloodstains

formed the foundation for Investigator Merchie's qualifications as an expert witness.

¶ 39    Defendant has not alleged that Investigator Merchie's methods and principles were not generally accepted in the scientific community, nor that Investigator Merchie lacks training in this field of expertise. Instead, he bases his argument on Investigator Merchie's conclusions regarding the crime scene in this case. However, defendant's claims relate to the weight to be afforded Investigator Merchie's testimony, not the foundation for qualification as an expert witness. See *Comier*, 2020 IL App (1st) 170500, ¶ 83 ("[A]ny weakness in the basis of an expert's opinion goes to the weight of the testimony ***." (Internal quotation marks omitted.)). As we explain further below, defendant's challenge to the weight of the expert's opinion does not amount to a constitutional infirmity.

¶ 40    Following his testimony about his training and methodology as foundation for his expert opinion, Investigator Merchie detailed his analysis of the bloodstain pattern from this case. In 2011, he was directed to review evidence from Lindsey's 1991 homicide, including a belt, a pair of shoes, a pair of pants, a sweatshirt, and a jacket. Investigator Merchie detailed his analysis of the shoes, beginning with the right shoe. He found over 100 individual stains on the toe, the top of the vamp, and the eyelet area of the right shoe, which ranged in size from a submillimeter to approximately six millimeters. He did not find sufficient bloodstains on the back of the shoe for an analysis.

¶ 41    The information about the size, the pattern, and the number of bloodstains on the right shoe "indicated that the source of the blood, of the liquid blood was extended someplace in front of the shoe as the way the shoe pointed." The source was "out straight from the toe area," and blood broke down into smaller stains as it came towards the shoe. "And that's why on the toe was the more rounded perpendicular, and on the top which is a horizontal surface and on the

sides which is a surface not facing that source the stains were more elongated showing that they struck—that the direction was still pointed towards *** the toe." In his opinion, these stains could not have been left by incidental contact and were classified as impact splatter. This size of bloodstains was typical to blunt force trauma of an object. He observed that there were fewer stains on the left shoe compared to the right shoe, with approximately 20 to 30 stains at the most on the entire shoe. He also noted that the stains were not "straight on the shoe" but were more toward the right side of the shoe.

¶ 42     Investigator Merchie also detailed his analysis of the pants. He found many more stains on the right leg than on the left leg, and the majority of the stains on both legs were from the cuff to the knees. He noted that the absorbency of the cloth distorted the patterns and did not show direction. Based on the number of stains, he opined that the right pant leg and the right shoe were "closer to the source of the spatter" than the left pant leg and left shoe. The stains also indicated that the right pant leg and right shoe were "in the same or approximately the same location" when the blood struck both items. The toe of the right shoe was pointed toward the source of the blood, with the sole most likely on the floor and within two to three feet from the source of the blood.

¶ 43     On cross-examination, defense counsel thoroughly questioned Investigator Merchie regarding his reports and methodology. He repeatedly questioned Investigator Merchie about his lack of measurements and calculations. Investigator Merchie responded, "There w[ere] no calculations to do." He explained that, based on his training and education, he was trying to determine direction and angle of impact.

¶ 44     Defendant's petition, as framed, does not plead the denial of a substantial constitutional claim. Stated another way, and accepting all of the factual allegations as true and disregarding

19

legal conclusions unsupported by fact, defendant's petition amounts to nothing more than a sufficiency of the evidence claim or reasonable doubt argument. Specifically, he does not dispute that the methodology employed by Investigator Merchie was reasonably relied on by experts in bloodstain pattern analysis. Rather, he argues that Investigator Merchie's conclusions were subjective and lacked scientific certainty. "Where the results of a scientific procedure or methodology have been accepted by a court based on its reliability, the certainty of a qualified expert regarding conclusions drawn through use of that procedure or methodology goes to the weight of the testimony, not admissibility." *People v. Cole*, 170 Ill. App. 3d 912, 931 (1988). " '[T]he basis for a witness' opinion generally does not affect his standing as an expert; such matters go only to the weight of the evidence ***.' " *Simmons*, 2016 IL App (1st) 131300, ¶ 121 (quoting *Snelson v. Kamm*, 204 Ill. 2d 1, 26-27 (2003)). "And 'the weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion." *Id.* (quoting *Snelson*, 204 Ill. 2d at 27). Further, arguments about the persuasiveness of an expert's conclusions go to weight, not admissibility. *McNeal*, 2019 IL App (1st) 180015, ¶ 33 (citing *Snelson*, 204 Ill. 2d at 26-27).

¶ 45   As detailed above, Investigator Merchie thoroughly set forth his training in bloodstain analysis, beginning in 1990 with over 200 hours of instruction and training. He also explained the methodology employed in his analysis to determine the location of items in relation to the blood source based on the direction and size of the bloodstains. Defendant has not pled any allegations to challenge or rebut the foundation for Investigator Merchie's testimony that the methods he used were reasonably relied on by experts in the field. Defendant's argument does not raise any challenges to this testimony; rather he focuses on a few points related to this specific case. These claims go to the weight to be given Investigator Merchie's testimony, not

the foundation. Because his argument relates to the weight afforded to Investigator Merchie's conclusions, defendant is in essence challenging the sufficiency of the evidence at trial. However, it is well established that sufficiency of the State's evidence is not a proper issue for a postconviction proceeding. *People v. Evans*, 2017 IL App (1st) 143268, ¶ 30. It has long been established that reasonable doubt of a defendant's guilt is not a proper issue for a postconviction proceeding. *People v. Frank*, 48 Ill. 2d 500, 504 (1971). Succinctly stated, it is not the purpose of the Post-Conviction Act to redetermine guilt or innocence. *People v. Eddmonds*, 143 Ill. 2d 501, 510 (1991). Again, the purpose of a postconviction proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal. *Barrow*, 195 Ill. 2d at 519. Defendant unsuccessfully challenged the sufficiency of the evidence on direct appeal. See *Dixon*, 2018 IL App (1st) 153211-U, ¶¶ 50-59. That claim has already been rejected by this court and cannot be relitigated again.

¶ 46    Moreover, trial counsel effectively cross-examined Investigator Merchie on these points, which allowed the jury to evaluate the testimony, and it was up to the jury to determine the weight given. The jury, as the trier of fact, was responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70. Thus, any weaknesses in Investigator Merchie's expert opinion went to the weight of the testimony and did not affect its admissibility. See *Comier*, 2020 IL App (1st) 170500, ¶ 83.

¶ 47    We also find defendant's reliance on *People v. Safford*, 392 Ill. App. 3d 212 (2009), and *People v. Jones*, 2015 IL App (1st) 121016, to be misplaced. *Jones* was vacated following the death of the defendant pursuant to a supervisory order entered by the Illinois Supreme Court and

is no longer good law. See *Simmons*, 2016 IL App (1st) 131300, ¶ 116 ("We cannot consider *Jones*, as that judgment has no effect."). Defendant's argument in his reply brief that this court should continue to follow the reasoning in *Jones* is not well taken. "The effect of a vacated order is that of a void order." *Kelch v. Watson*, 237 Ill. App. 3d 875, 877 (1992). As the court in *Simmons* concluded, this court cannot "consider *Jones*, as that judgment has no effect." *Simmons*, 2016 IL App (1st) 131300, ¶ 116.

¶ 48    In *Safford*, a latent print examiner testified that the defendant's fingerprint matched one found near the scene of a shooting, but he did not explain how he arrived at that conclusion. *Safford*, 392 Ill. App. 3d at 216-17. The examiner explained that his practice was to look at three levels of detail on each fingerprint during his analysis in order to come up with points of comparison, but he does not take notes when he finds points of comparison, nor does he record how or why he arrives at his conclusions. He only notes whether a latent print matches a known print, and he never testified to any number of points of comparison that he found between the latent print and the defendant's print. *Id.* at 217. The defendant argued on appeal that the trial court erred in allowing the examiner to testify as to his conclusion that the latent print recovered belonged to the defendant without ever testifying to the evidentiary basis for his opinion. *Id.* at 220. The majority of the reviewing court concluded that the lack of evidentiary foundation for the expert's testimony prevented the defense from conducting a meaningful cross-examination. *Id.* at 223-24. Based on this conclusion, the *Safford* court held that this testimony failed to disclose an adequate foundation for the examiner's opinion, rendering his testimony inadmissible. *Id.* at 226, 228. "If the foundation for the expert's opinion is not subject to scrutiny, the jury may ascribe an 'aura of reliability and trustworthiness' to the expert's conclusion." *Id.* at 226.

¶ 49    In his dissent, Justice Wolfson found that the expert's testimony was sufficient to place his conclusions before the jury. *Id.* at 231 (Wolfson, J., dissenting). He further noted that the examiner disclosed the methods he used in comparing the prints and his conclusion and that the lack of testimony concerning the points of comparison went to the weight of the examiner's opinions, not the admissibility. *Id.* He stated that the lack of specificity in the examiner's testimony was a point of "vigorous" cross-examination and that it was up to the jury to decide whether to accept the testimony. *Id.* at 232.

¶ 50    The majority opinion in *Safford* has since been heavily criticized by multiple appellate panels. See *People v. Robinson*, 2018 IL App (1st) 153319, ¶ 19 (observing that it could "find no published case following *Safford*'s reasoning"); *People v. Wilson*, 2017 IL App (1st) 143183, ¶¶ 41-42 (finding that *Safford*'s "ultimate holding—namely, that to establish an adequate foundation for an expert opinion, the expert must testify to the factual basis for the opinion on direct examination—runs counter to *Wilson* [*v. Clark*, 84 Ill. 2d 186, 194 (1981)], *Williams*, and Rule 705, all of which stand for the basic proposition that the basis of an expert's opinion is a matter for cross-examination"); *Simmons*, 2016 IL App (1st) 131300, ¶ 124 ("And looking to *Safford* itself, we conclude that its analysis was flawed. While the court in *Safford* cited the principle that the information on which an expert bases his opinion must be reliable [citation], it did not correctly analyze that principle."); *People v. Negron*, 2012 IL App (1st) 101194, ¶ 41 (finding *Safford* to be "an outlier case").

¶ 51    We similarly decline to follow *Safford* and find it distinguishable from the facts in this case. Investigator Merchie not only set forth his methodology, but he also described the basis for his opinions. During his testimony, he referred to photographs of the shoes and pants to explain his opinions and his reasoning. Specifically, he explained his conclusion that the right pant leg

and shoe were closer to the blood source based on the number of bloodstains. He further explained that the sole of the shoes was likely on the floor, based on the placement of the bloodstains. He testified that this methodology was generally accepted within the scientific community. Unlike in *Safford*, Investigator Merchie fully detailed the basis for his opinions and described his findings to the jury. Any weaknesses in his opinion went to its weight, not the admissibility. See *Safford*, 392 Ill. App. 3d at 231 (Wolfson, J., dissenting). Defendant does not cite any reasoned authority for his position on appeal apart from *Safford* and *Jones*, which this court has refused to follow for the reasons stated above. Again, we find that an adequate foundation was presented for Investigator Merchie's opinions and that defendant's claims relate to the weight afforded by the jury to those opinions.

¶ 52    Defendant also attached a six-page excerpt of an unpublished report titled "Strengthening Forensic Science in the United States: A Path Forward," which was submitted to the United States Department of Justice in 2009, discussing the reliability of bloodstain analysis. See Nat'l Research Council, Strengthening Forensic Science in the United States: A Path Forward (2009), https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf [https://perma.cc/6JNH-6M3R]. While we acknowledge this report's inclusion, it does not alter the foundation the State set forth for Investigator Merchie's testimony. Moreover, this report does not diminish the fact that blood pattern analysis is widely accepted in the scientific community; it only notes some might say that bloodstain pattern analysis is more subjective than scientific. Significantly, the report does not support defendant's argument that a sufficient foundation was not set forth for Investigator Merchie's expert testimony.

¶ 53    Since defendant's contentions go to the weight of Investigator Merchie's testimony, he failed to present an arguable claim that his appellate counsel's decision not to raise this claim

was objectively unreasonable. Defendant's suggestion that Investigator Merchie's expert testimony lacked foundation has been clearly rebutted by the record. See *Sanders*, 2016 IL 118123, ¶ 48. As discussed, a sufficient foundation was set forth to support Investigator Merchie's expert opinion. He explicitly testified that his methodology was a type reasonably relied on by experts in bloodstain pattern analysis. Defendant has never alleged that bloodstain pattern analysis is not accepted by the scientific community, which he would have had to plead to state a constitutional claim. Since the underlying issue lacks merit, defendant cannot establish that he arguably suffered any prejudice from counsel's failure to raise it on direct appeal. See *Childress*, 191 Ill. 2d at 175. Accordingly, defendant's claim of ineffective assistance of appellate counsel fails, and his postconviction petition was properly dismissed as frivolous and patently without merit.

¶ 54    Even if defendant had raised a foundation claim, which we do not find, he has not shown ineffective assistance of appellate counsel under *Strickland* because defendant cannot establish that he was arguably prejudiced. As previously stated, under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697. In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 55    Defendant contends that Investigator Merchie's testimony was "the linchpin of the State's case" because his opinion was the closest to direct evidence that supported the State's theory that defendant was the perpetrator. We disagree. The substantial DNA and circumstantial evidence provided overwhelming evidence to support defendant's conviction. Even if the bloodstain pattern evidence were excluded, there was compelling evidence of defendant's guilt. Defendant's DNA was found under Lindsey's fingernails. Lindsey's DNA was found on defendant's bloodstained pants and shoes. This evidence supported the State's theory that defendant kicked and beat Lindsey before stabbing her with a knife. And the horrendous beating suffered by Lindsey was corroborated by the pathologist's report. Additionally, one of the knife handles contained a DNA mixture of defendant's and Lindsey's DNA.

¶ 56    Further, defendant's own testimony demonstrates his consciousness of guilt. According to defendant, an unknown assailant broke in and brutally murdered Lindsey, but defendant suffered only minor injuries. However, police found no evidence of forced entry at Lindsey's apartment. Defendant then left without seeking any help for Lindsey, went home, and suggested someone check on Lindsey. When Williams went to Lindsey's apartment, the back door was left open, which was unusual because Lindsey always locked her door. Defendant also stated that he had a secret sexual relationship with Lindsey that was unknown to Lindsey's friends and at the same time defendant's girlfriend was eight months pregnant with his child. Defendant's account changed from what he initially told police after Lindsey's murder to his trial testimony. Notably, he failed to include details in his initial statement immediately following Lindsey's death that he later recounted in his trial testimony. First, defendant testified that he struggled with an unknown assailant in Lindsey's apartment and that he was struck in the head by the assailant and lost consciousness. However, Lieutenant DeDore testified in rebuttal that defendant never mentioned

a struggle with the assailant or being struck in the head during the hospital interview. Investigator Brasic also stated in rebuttal that he would have photographed defendant's head if a head injury had been reported. Next, Lieutenant DeDore testified that defendant did not tell him that defendant touched and attempted to remove the knife in Lindsey's neck.

¶ 57 While defendant alleged that Lindsey sold drugs to support herself, no illegal substances were found in her system. The trial evidence rebutted defendant's statement and, in fact, offered a motive for him to kill Lindsey. Thus, even without the bloodstain analysis, the State overwhelmingly established defendant's guilt beyond a reasonable doubt. Accordingly, defendant has not shown it was arguable that he was prejudiced by his appellate counsel's failure to challenge the admission of Investigator Merchie's testimony. See *Cathey*, 2012 IL 111746, ¶ 23. His claim of ineffective assistance of appellate counsel is without merit.

¶ 58 Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 59 Affirmed.

*People v. Dixon*, 2022 IL App (1st) 200162

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-CR-13613; the Hon. Peggy Chiampas, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Katie Anderson, State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Matthew Connors, and Hayden Dinges, Assistant State's Attorneys, of counsel), for the People. |